Joan Levine GALL, as Executrix of the
Estate of Nathan Levine, Plaintiff,

v.

EXXON CORPORATION et
al., Defendants.

No. 75 Civ. 3682.

United States District Court,
S. D. New York.

July 30, 1976.

Kass, Goodkind, Wechsler & Gerstein, by Stuart D. Wechsler, Michael P. Fuchs, New York City, for plaintiff.

Sullivan & Cromwell, New York City, by Roy H. Steyer, David M. Olasov, Margaret Pfeiffer, for defendant Exxon Corp.

Shearman & Sterling, by Werner L. Polak, New York City, for defendants J. K. Jamieson, C. C. Garvin, Jr., T. D. Barrow, N. J. Campbell, Jr., E. G. Collado, D. M. Cox, H. C. Kauffman, G. T. Piercy, S. Vazquez and M. A. Wright.

White & Case, by Haliburton Fales, II, New York City, for defendants W. H. Franklin, T. V. Learson and D. S. MacNaughton.

OPINION

ROBERT L. CARTER, District Judge.

Defendants have moved, pursuant to Rule 56, F.R.Civ.P., for summary judgment dismissing plaintiff's complaint on the grounds that the Special Committee on Litigation ("Special Committee"), acting as the Board of Directors of Exxon Corporation ("Exxon"), has determined in the good faith exercise of its sound business judgment that it is contrary to the interests of Exxon to institute suit on the basis of any matters raised in plaintiff's complaint. Defendants' motion is hereby denied without prejudice to its renewal after plaintiff has conducted relevant discovery.

I

FACTS

Plaintiff's complaint arises out of the alleged payment by Exxon Corporation of some $59 million in corporate funds as bribes or political payments, which were improperly contributed to Italian political parties and others during the period 1963–1974, in order to secure special political favors as well as other allegedly illegal commitments.

Plaintiff sues derivatively on behalf of Exxon and its shareholders. See Amended Complaint, ¶ 4. Her complaint is in four counts. Count I charges that the individual defendants filed or caused to be filed with the SEC financial statements or other reports which were false and misleading in that they failed to disclose the allegedly illegal political contributions, in violation of Section 13(a) of the Securities Act of 1934 and Rule 13a–1 promulgated thereunder. Count II charges that the individual defendants used the mails and other instrumentalities of interstate commerce in order to file or cause to be filed false and misleading proxy statements, and solicited proxies from Exxon shareholders pursuant to such false statements in violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 142-9 promulgated thereunder, in that such statements omitted reference to the allegedly illegal political contributions. Count III charges the individual defendants with waste, spoliation and misuse of corporate assets. Count IV charges the individual defendants with breach of their fiduciary duties to Exxon.

The complaint demands that the individual defendants be held jointly and severally

liable for damages, including loss of goodwill, allegedly suffered by Exxon. It further demands, among other things, the commencement of an investigation through independent auditors in conjunction with plaintiff's counsel, the immediate election of four new members of the Board of Directors proposed by plaintiff and, within 12 months, the election of a new Chairman of the Board and President, and reconstituting the composition of the membership of the Board of Directors and Executive Committee, such that at least 55% of the Board and the Executive Committee be made up of independent outside directors.

## II

On September 24, 1975, Exxon's Board of Directors unanimously resolved, pursuant to

1. Article III, Section 1, reads as follows:

"1. The board, by resolution adopted by a majority of the entire board, may appoint from among its members an executive committee and one or more other committees, each of which shall have at least three members. To the extent provided in such resolution, each such committee shall have and may exercise all the authority of the board, except that no such committee shall (a) make, alter or repeal any by-law of the corporation; (b) elect any director, or remove any officer or directors; (c) submit to shareholders any action that requires shareholders' approval; or (d) amend or repeal any resolution theretofore adopted by the board which by its terms is amendable or repealable only by the board."

This by-law exercises the statutory authority granted to the Board pursuant to § 14A:6–9(1), N.J.S.A., to appoint committees that may "exercise all the authority of the board." That provision provides as follows:

"14A:6–9. Executive committee; other committees

(1) If the certificate of incorporation or the by-laws so provide, the board, by resolution adopted by a majority of the entire board, may appoint from among its members an executive committee and one or more other committees, each of which shall have at least three members. To the extent provided in such resolution, or in the certificate of incorporation or in the by-laws, each such committee shall have and may exercise all the authority of the board, except that no such committee shall

(a) make, alter or repeal any by-law of the corporation;

(b) elect or appoint any director, or remove any officer or director;

Article III, Section 1, of Exxon's By-Laws [1] to establish a Special Committee on Litigation, composed of Exxon directors Jack F. Bennett, Richard P. Dobson and Edward G. Harness,[2] and refer to the Special Committee for the determination of Exxon's action the matters raised in this and several other pending actions relating to the Italian expenditures. With respect to the matters within its mandate, the Special Committee acts as the Board of Directors of Exxon. The Resolution establishing the Special Committee reads as follows:

"RESOLVED, That, pursuant to Article III of the By-Laws of the Corporation, there is hereby established a Special Committee on Litigation which shall consist of the following members of the Board: Messrs. J. F. Bennett, R. P. Dobson and E. G. Harness, each of whom has orally

(c) submit to shareholders any action that requires shareholders' approval; or

(d) amend or repeal any resolution theretofore adopted by the board."

2. Mr. Bennett became an Exxon employee on July 1, 1975, after leaving the post of Under Secretary for Monetary Affairs of the United States Treasury Department, and became a director and senior vice president of Exxon on August 1, 1975. He had been an official of the United States Treasury Department from September, 1971, to June, 1975. From 1955 to September, 1971, he had been employed by Exxon or an affiliate of Exxon.

Messrs. Dobson and Harness are non-employee ("outside") directors of Exxon, who were first elected to the Board on May 15, 1975. Mr. Dobson is chairman and chief executive officer of British-American Tobacco Company, Limited, a manufacturer of tobacco products with operating divisions in the paper, cosmetics and retail industries. Mr. Harness is chairman of the board and chief executive officer of the Proctor & Gamble Company. According to the affidavits submitted, each of the members of the Special Committee has confirmed that he has not been in any way connected or involved with the matters relating to the Italian expenditures referred to in this action or in the other related actions and none has been named as a defendant in any of the pending actions. Indeed, none of the members of the Committee was elected to the Exxon Board until long after the Italian expenditures complained of were terminated and Exxon had taken steps to ensure that such expenditures would not be resumed. See Anderson Affidavit (11–3–75) at ¶¶ 14, 17–19.

confirmed at this meeting that he had not been in any way connected or involved with matters referred to in the demand made on behalf of Stephen W. Lane and the claims made by Abraham Wechsler, Joan Levine Gall and Kathleen E. Shaw relating to payments made by or on behalf of Esso Italiana S.p.A. and is not aware of any reason which might disqualify him from serving on the Committee. Two members of the Committee shall constitute a quorum thereof. The Committee shall designate its Chairman and Vice-Chairman and its Secretariat, fix its own rules of procedure and shall meet where and as provided by such rules or by resolution of the Committee. The Committee shall act only on the affirmative vote of a majority of the members present at a meeting.

The Committee shall

(1) conduct or cause to be conducted such review, analysis and further investigation of the circumstances surrounding all matters referred to in the aforesaid demand and claims relating to payments by or on behalf of Esso Italiana S.p.A. as the Committee deems necessary or desirable to determine whether or not the Corporation shall undertake any litigation against any one or more of the present or former Directors or present or former officers of the Corporation in respect of such matters;

(2) make the determination contemplated in (1) above; and

(3) undertake and supervise any action necessary or appropriate to implement any such determination."

On January 23, 1976, after an investigation of approximately four months, including interviews with over 100 witnesses, the Special Committee issued the "Determination and Report of the Special Committee on Litigation" ("Report"), an 82-page document summarizing the Committee's findings and recommendations. The facts as uncovered by the Special Committee may be briefly summarized as follows.

The matters complained of by plaintiff center around the activities of Dr. Vincenzo Cazzaniga who was President and Managing Director of Esso Italiana, a wholly-owned subsidiary of Exxon Corporation. Exxon's investigation revealed that in 1964 and 1965, and again in 1971 Cazzaniga secretly (and apparently without authorization by Exxon) entered into certain side agreements in the name of Esso Italiana in connection with a transaction between Esso International (another Exxon subsidiary) and SNAM, a gas pipeline subsidiary of the Italian State petroleum company, ENI. In 1971, presumably pursuant to these side agreements, Cazzaniga made several unauthorized payments out of the funds of Esso Italiana to SNAM. The payments were in excess of $10 million.

Exxon's investigation further revealed that during the period 1963–72, Cazzaniga had made other unauthorized payments of approximately $19 million. The $10 million of unauthorized payments to SNAM and approximately $19 million of other unauthorized payments were largely made from approximately forty secret bank accounts not recorded on the books of Esso Italiana, and known only to Cazzaniga and, in part, his personal assistants. There also flowed through these secret bank accounts approximately $13.5 million purportedly expended with respect to authorized political contributions but which the investigation revealed had been recycled into the secret accounts. The forty bank accounts were also funded by rebates and bank overdrafts. The overdrafts totalled approximately $19 million outstanding at the time of their discovery in 1972. The total amount that flowed through the secret accounts was approximately $39 million, including bank interest and commission charges of approximately $3 million.

The investigation also revealed that political contributions by Esso Italiana to various Italian political parties during the nine-year period from 1963 through 1971 totalled $27.9 million. The amounts per year were as follows:

|      | $ millions |
|------|-----------|
| 1963 | 0.8 |
| 1964 | 1.1 |
| 1965 | 1.0 |
| 1966 | 2.5 |
| 1967 | 3.8 |
| 1968 | 5.8 |
| 1969 | 5.7 |
| 1970 | 3.5 |
| 1971 | 3.7 |
|      | $27.9 |

Of this amount, $13.5 million were recycled into one or more of the 40 secret bank accounts.[3] All political contributions by Esso Italiana were ended in 1972.

It is clear that several of the Exxon directors named as defendants in this suit were aware of the existence of the political payments in Italy prior to their termination in 1972.

N. J. Campbell became President of Esso Europe in 1966, and an Exxon director in January, 1971. He is currently a director. According to the Report, Campbell claims that he first heard of political contributions in July or August, 1968, when M. W. Johnson, who was about to retire as Senior Vice-President of Esso Europe, briefed him with respect to the subject, explaining that the contributions were destined for political parties, and that the conduits for the payments were the newspapers and public relations firms controlled by the parties. Campbell was surprised by the amounts. Johnson explained that the political parties had very large budgets and that all industries had to contribute to them. Johnson assured Campbell that the contributions were legal, and further, that he and Stott, the Exxon Contact Director for Esso Europe, had been urging Cazzaniga to reduce the contributions, though in fact they had been growing each year.

Campbell gave instructions that the payments be promptly phased down and ordered the controller of Esso Europe, D. J. Thompson, to set up a system to keep track of the amounts being spent. Thompson thereafter established a special budget format by which Cazzaniga reported to him and he in turn reported to H. T. Cruikshank, who succeeded Johnson as Senior Vice President of Esso Europe with contact responsibilities for Italy. These reports provided both an annual total and an allocation of the total into approximately a dozen objectives of the industry and of Esso Italiana. As such the budget contained references to specific problems as matters of concern, coupled with monetary figures allocated to each. This special budget format prompted the Special Committee to inquire as to whether the figures represented sums which were to be paid as an agreed consideration for official action, or inaction, with respect to specific matters, and hence be thought to constitute bribery. The Special Committee concluded that they did not.

Campbell did not learn of the breakdown of the budget totals into components until the 1972 investigation. He knew only of the single figure for each year, though Cazzaniga on the occasion of a general meeting in Baden Baden in October, 1969, mentioned to him one of the specific objectives which Cazzaniga argued would require a continuation of political payments. Cruikshank told Campbell that none of the moneys went to individuals.

In July, 1969, R. E. Mays, who had become Controller of Exxon in December, 1968, talked with Campbell in London about the political contributions, expressing concern over the absence of controls and urging prompt elimination of the payments.[4] Campbell informed Mays that he had decided to phase out the expenditures over a

---

3. In order to achieve confidentiality, moneys to be used for political contributions were drawn from regular accounts and paid to newspapers and public relations agencies, among others, against invoices purportedly for services. These newspapers and agencies were known to be conduits for contributions to particular political parties. In addition, some payments were made on dummy invoices and others from rebates received by Esso Italiana.

4. Mays also claims that he told Campbell in 1969 of the use of false invoices by Esso Italiana.

couple of years rather than immediately because he had given weight to the view pressed upon him by Cazzaniga that an abrupt termination would lead to harmful repercussions in Italy.

Some time later in 1969, Campbell, while on a visit to the United States, sought the advice of E. B. Paust, Exxon's General Counsel, with respect to the payments. Paust then arranged that an opinion on the subject be obtained from Exxon's outside counsel in Italy. Paust later informed Campbell that he had confirmed that political contributions were lawful in Italy.

Some time in the latter half of 1968, Paust, and A. O. Savage, the Controller of Exxon (both of whom are now deceased) met with J. K. Jamieson,[5] then President of Exxon, and informed him that political contributions were being made in Italy but that the contributions were legal; that Esso Europe was taking steps to phase them down; and that Jamieson did not need to become involved.[6]

H. C. Kauffmann,[7] who had become President of Esso Europe in December, 1970, knew of political contributions in Italy and, on inquiry of Cruikshank, received the total figures for expenditures in 1970 and the proposed figures for 1971. He was unhappy about the situation even though he had been assured as to the legality of the contributions.

According to the Report, an incident in July, 1971, resulted in an order by Kauffmann to terminate the Special Budget.

Briefly, the facts surrounding the termination of the Special Budget format are as follows. Cazzaniga had submitted a proposal for the settlement of an outstanding dispute with the Italian government coupled with a request for an addition to the Special Budget, which Cazzaniga's request associated with the proposed settlement. The settlement, apart from the question of a contribution, was considered a reasonable compromise in light of the advice of Esso Italiana's management that the outcome of the pending lawsuit was unpredictable. Kauffmann was convinced that Cazzaniga had already made the commitment, and that there was the prospect of political recrimination if the settlement was not carried out, or if the settlement was carried out and Cazzaniga's commitment for a contribution was disavowed. According to the Report, Kauffmann was outraged by the proposal, believing that it was reprehensible to associate any discussion of a political contribution with a discussion of the settlement of a dispute. He nevertheless concluded that he would have to abide by the commitment which he believed Cazzaniga had made. But Kauffmann immediately ordered that there would be no further Special Budget, and no further Special Budget was thereafter approved by Esso Europe.[8]

It is likely that the subject of political contributions was mentioned to the Audit Committee of the Exxon Board at its October, 1970, meeting. The Audit Committee at that time included defendants W. H. Franklin and E. G. Collado.[9] The Report indicates that there was only a passing reference to the subject of political contributions in terms which did not suggest unlaw-

5. Jamieson was Chairman of Exxon from October, 1969 to July, 1975. He is currently a director.

6. In 1969, Mays, who succeeded Savage as Exxon Controller, was told by Paust that Jamieson did not need to be told more about the subject—"the reason being not any question of legality but rather, that such contributions, although legal, would not be understood in the United States, and, detailed knowledge could be embarrassing to the Chief Executive at some occasion on a witness stand." Report, at 25–26.

7. Kauffmann was an Exxon director since 1974 and is currently President.

8. This incident was considered for disclosure in 1973. The Exxon Law Department and Sullivan & Cromwell concluded that disclosure was not required.

9. Defendant Franklin has been a non-employee director since 1969. Defendant Collado was a director from 1960 to 1975.

fulness. There has been no report that the subject of political contributions was mentioned to the members of the Audit Committee at any other time prior to 1972.

Finally, the Report mentions that several directors were aware—prior to 1972—of the existence of political contributions in Italy, but were unaware—again, prior to the disclosures of 1972—of the off-the-books bank accounts maintained by Cazzaniga, or of the Special Budget format initiated in 1968. In this category is C. C. Garvin, Jr., who later became Chairman and Chief Executive Officer of Exxon.[10] Garvin was informed about the existence of political contributions in Italy some time in the latter half of 1969 by the Controller, Mays. At the time, Garvin was serving for a brief period as Contact Director for Europe. Garvin's recollection is that Mays told him the budget was too large but that it was being reduced or phased out by Esso Europe and that Paust had said that the contributions were legal.

Finally, D. M. Cox[11] claims that some time during the several years prior to September, 1967, while he was a Vice President for natural gas of Esso Europe, he became aware through some conversation with Thompson that political contributions were being made in Italy.

Apart from those discussed above, the remainder of the directors (both past and present) were apparently unaware that political contributions were being made—at least until the Exxon investigation in 1972.

The subject of political payments never came before the Board prior to the disclosures of 1972, nor did the subject come before any committee of the Board prior to 1972—except before the Audit Committee in October, 1970, discussed above.

### III

After careful review, analysis and investigation, and with the advice and concurrence of Special Counsel,[12] the Special Committee unanimously determined on January 23, 1976, that it would be contrary to the interests of Exxon and its shareholders for Exxon, or anyone on its behalf, to institute or maintain a legal action against any present or former Exxon director or officer.[13] The Committee further resolved to direct and authorize the proper officers of Exxon and its General Counsel to oppose and seek dismissal of all shareholder derivative actions relating to payments made by or on behalf of Esso Italiana S.p.A., which had been filed against any present or former Exxon director or officer.[14]

### IV

*Discussion*

■ There is no question that the rights sought to be vindicated in this lawsuit are those of Exxon and not those of the plaintiff suing derivatively on the corporation's behalf. *See Smith v. Sperling,* 354 U.S. 91, 99, 77 S.Ct. 1112, 1 L.Ed.2d 1205

---

**10.** Defendant Garvin is currently a director and Chairman of Exxon's Board.

**11.** Defendant Cox has been an Exxon director since 1971.

**12.** At its second meeting, on October 29, 1975, the Special Committee appointed Justice Joseph Weintraub, former Chief Justice of the New Jersey Supreme Court, as its Special Counsel.

**13.** Among the factors cited by the Special Committee in reaching its decision were the unfavorable prospects for success of the litigation, the cost of conducting the litigation, interruption of corporate business affairs and the undermining of personnel morale.

**14.** The resolution of the Special Committee on Litigation provides:

RESOLVED, That, based upon its review, analysis and investigation of the circumstances surrounding all matters referred to in the demand made on behalf of shareholder Stephen W. Lane and the claims made by shareholders Abraham Wechsler, Joan Levine Gall and Kathleen E. Shaw relating to payments made by or on behalf of Esso Italiana S.p.A., the Special Committee on Litigation has determined that it would be contrary to the interests of the Corporation and its shareholders for the Corporation, or anyone on its behalf, to institute or maintain a legal action against any present or former director or officer of the Corporation.

(1957) (Frankfurter, J., dissenting).[15] Since it is the interests of the corporation which are at stake, it is the responsibility of the directors of the corporation to determine, in the first instance, whether an action should be brought on the corporation's behalf. It follows that the decision of corporate directors whether or not to assert a cause of action held by the corporation rests within the sound business judgment of the management.[16] *See, e. g., United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 263–4, 37 S.Ct. 509, 61 L.Ed. 1119 (1917); *Corbus v. Alaska Treadwell Gold Mining Co.,* 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256 (1903); *Hawes v. Oakland,* 104 U.S. 450, 26 L.Ed. 827 (1881); *Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir. 1975); *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973); *Ash v. International Business Machines, Inc.,* 353 F.2d 491, 492–3 (3d Cir. 1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Bernstein v. Mediobanca Banca di Credito Finanziario-S. p.A.,* 69 F.R.D. 592, 595 (S.D.N.Y.1974); *Klotz v. Consolidated Edison Co. of New York, Inc.,* 386 F.Supp. 577, 581 (S.D.N.Y. 1974). *See also, Kemper v. American Broadcasting Companies, Inc.,* 365 F.Supp. 1272, 1274 (S.D.Ohio 1973).

This principle, which has come to be known as the business judgment rule, was articulated by Mr. Justice Brandeis speaking for a unanimous Court in *United Copper Securities Co. v. Amalgamated Copper Co., supra,* 244 U.S. at 263–64, 37 S.Ct. at 510. In that case the directors of a corporation chose not to bring an antitrust action against a third party. Mr. Justice Brandeis said:

"Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management, and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment. . . . "

Similarly, in *Ash v. International Business Machines, Inc., supra,* 353 F.2d at 493, the Third Circuit held:

" . . . a stockholder's derivative action, whether involving corporate refusal to bring antitrust suits or some other controversial decision concerning the conduct of corporate affairs, can be maintained only if the stockholder shall allege and prove that the directors of the corporation are personally involved or interested in the alleged wrongdoing in a way calculated to impair their exercise of business judgment on behalf of the corporation, or that their refusal to sue reflects bad faith or breach of trust in some other way."

*See also, Corbus v. Alaska Treadwell Gold Mining Co., supra; Klotz v. Consolidated Edison Co. of New York, Inc., supra;* 386 F.Supp. at 581.

A recent case in this District, *Lasker v. Burks,* 404 F.Supp. 1172 (S.D.N.Y.1975) (Werker, J.) is closely on point. There, two shareholders brought a derivative action on behalf of a mutual fund alleging that various of the fund's directors and its investment adviser (Anchor) had violated the Investment Advisers Act and common law in accepting without independent analysis the adviser's recommendation to purchase com-

---

**15.** Justice Frankfurter's opinion applies also to *Swanson v. Traer,* 354 U.S. 114, 77 S.Ct. 1116, 1 L.Ed.2d 1221 (1957).

**16.** The "demand" rule embodied in Rule 23.1, F.R.Civ.P., may be thought of as the corollary of the business judgment rule. Thus, the purpose of the demand rule "is to give the derivative corporation itself the opportunity to take over a suit which was brought on its behalf in the first place, and thus to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." *Brody v. Chemical Bank,* 517 F.2d 932, 934 (2d Cir. 1975); *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973).

mercial paper of the Penn Central Transportation Company. After a thorough investigation and upon advice of Special Counsel, a minority quorum of disinterested directors determined that the derivative suit was not in the best interests of the fund and then moved to dismiss the action on the ground that their good faith business judgment not to bring suit was a final one which could not be circumvented by the shareholders suing derivatively.

Judge Werker ruled that:

" . . . the Board of Directors met and designated the independent directors to make a decision as to the Fund's position in that suit. In the Court's view, the independent minority of directors had the power to decide what position the Fund should take. This is consistent with the policy that a corporation be given the opportunity to control a lawsuit brought on its behalf, that the Board be allowed to exercise its normal functions in running the corporation, and that a derivative suit should be resorted to as a last alternative."

404 F.Supp. 1172, at p. 1179

The Court went on to express the opinion that "the directors of a corporation should be given the chance to perform their duties in running the business of the corporation including whether to prosecute a cause of action. If they have exercised their business judgment in good faith then a decision not to sue should be final." *Id.,* at p. 1180.

■ It is clear that absent allegations of fraud, collusion, self-interest, dishonesty or other misconduct of a breach of trust nature, and absent allegations that the business judgment exercised was grossly unsound, the court should not at the instigation of a single shareholder interfere with the judgment of the corporate officers. *See Bernstein v. Mediobanca Banca di Credito Finanziario-S.p.A., supra;* 69 F.R.D. at 595; *Lasker v. Burks, supra,* 404 F.Supp. 1172, at p. 1180; *Klotz v. Consolidated Edison of New York, Inc., supra,* 386 F.Supp. at 582.

The question remains as to the requisite showing of good faith on the part of the corporate directors sufficient to warrant a dismissal based on the business judgment rule defense. In *Swanson v. Traer,* 354 U.S. 114, 116, 77 S.Ct. 1116, 1 L.Ed.2d 1221 (1957), the Supreme Court noted that the classical description of those situations where a shareholder may sue on behalf of his corporation was contained in *Hawes v. Oakland, supra.* The *Swanson* court quoted *Hawes* as follows:

"Some action or threatened action of the managing board of directors or trustees of the corporation which is beyond the authority conferred on them by their charter or other source of organization;

"Or such a fraudulent transaction completed or contemplated by the acting managers, in connection with some other party, or among themselves, or with other shareholders as will result in serious injury to the corporation, or to the interests of the other shareholders;

"Or where the board of directors, or a majority of them, are acting for their own interest, in a manner destructive of the corporation itself, or of the rights of the other shareholders;

"Or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation, which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity."

354 U.S. at 116, 77 S.Ct. at 1118.

In this regard, plaintiff challenges the independence of the Special Committee's judgment, arguing that the decision of the Special Committee was, in effect, a decision by those accused of the wrongdoing or by a body under the control of those accused of the wrongdoing. Thus, plaintiff contends that it was the decision of the full Board of Directors themselves to uphold and follow the determination of the Special Committee, and not the Committee's determination, which governs the present posture taken by Exxon in this suit. Plaintiff asserts that Exxon's Board of Directors was free to disband the Committee, to repeal any and all resolutions made empowering the Com-

mittee, and to pass a resolution ignoring the determination of the Committee and have Exxon sue its directors for restitution for their wrongdoings. In sum, argues plaintiff, since the Board of Directors could have caused the corporation to act contrary to the determination of the Committee, the Committee's determination was, in effect, only advisory and the effective determination to seek dismissal of this suit was made by the directors personally through their support of the Committee's recommendations. In sum, plaintiff contends, since the effective determination not to sue was made by the directors, who are the individual defendants herein, the decision was not made independently of such defendants.

■ This argument clearly misses the mark. The focus of the business judgment rule inquiry is on those who actually wield the decision-making authority, not on those who might have possessed such authority at different times and under different circumstances. In no sense was the decision of the Special Committee not to sue merely an advisory one. Indeed, in carrying out its investigation and in reaching its conclusions, the Special Committee exercised the full powers of the Board.[17]

Plaintiff next argues that the challenged political payments were illegal and that such illegality removes this case from the operation of the business judgment rule. Plaintiff places primary reliance in this regard on the opinion of Chief Justice Hughes in *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In *Ashwander,* certain stockholders of an Alabama electric utility sought to maintain a derivative suit to enjoin the utility from performing under its contract with the TVA on the grounds that the contract was beyond the powers which Congress could validly confer under the Constitution. Three Justices joined in the opinion of the Chief Justice, upholding the powers of Congress.

The Court held as follows:

"In seeking to prevent the carrying out of the contract, the suit was directed not only against the Power Company, but against the Authority and its directors upon the ground that the latter, under color of the statute, were acting beyond the powers which the Congress could validly confer. In such a case it is not necessary for stockholders—when their corporation refuses to take suitable measures for its protection—to show that the managing board or trustees have acted with fraudulent intent or under legal duress. To entitle the complainants to equitable relief, in the absence of an adequate legal remedy, it is enough for them to show the breach of trust or duty involved in the injuries and illegal action. Nor is it necessary to show that the transaction was *ultra vires* of the corporation.

The illegality may be found in the lack of lawful authority on the part of those with whom the corporation is attempting to deal. Thus, the breach of duty may consist in yielding, without appropriate resistance, to governmental demands which are without warrant of law or are in violation of constitutional restrictions. The right of stockholders to seek equitable relief has been recognized when the managing board or trustees of the corporation have refused to take legal measures to resist the collection of taxes or other exactions alleged to be unconstitutional [citations omitted]. . . . The fact that the directors in the exercise of their judgment, either because they were disinclined to undertake a burdensome litigation or for other reasons which they regarded as substantial, resolved to comply with the legislative or administrative demands, has not been deemed an adequate ground for denying to the stockholders an opportunity to contest the validity of the governmental requirements to which the directors were submitting." 297 U.S. at 319–320, 56 S.Ct. at 470.

Three other Justices (Stone, J., Roberts, J., Cardozo, J.) joined in the concurring opinion of Mr. Justice Brandeis who concluded that

---

**17.** *See* note 1, *supra,* citing Article III, Section I of Exxon's By-Laws, and N.J.S.A. § 14A:6–9(1).

it was unnecessary to reach the constitutional issue since the business judgment rule precluded the stockholders' suit in any event. The concurring opinion relied on *United Copper Securities Co. v. Amalgamated Copper Co., supra,* and *Hawes v. Oakland, supra.* Fortunately, it is not "necessary to choose between the wisdom of Chief Justice Hughes and that of Mr. Justice Brandeis." *Klotz v. Consolidated Edison Co. of New York, Inc., supra,* 386 F.Supp. at 583. Even assuming the correctness of the view expressed by the Chief Justice, its rationale does not apply in the instant case. *Ashwander* may be read quite narrowly as holding only that a shareholder may sue on behalf of his corporation where the corporation has declined to bring an action, in order to prevent the corporation from surrendering its property pursuant to statutory or regulatory controls which are challenged as unconstitutional. Since no "usurpation of regulatory control" is at issue here, the rule in *Ashwander* is inapplicable.

Furthermore, *Ashwander* is distinguishable on other grounds as well. There, plaintiffs sought injunctive relief preventing the corporation from continuing to participate in allegedly illegal activity. In contrast, Exxon decided to end the practice of political payments complained of here, and such payments were terminated in 1972.

Thus, even assuming that the political payments in Italy were illegal where made, the business judgment rule is nonetheless applicable. The decision not to bring suit with regard to past conduct which may have been illegal is not itself a violation of law and does not result in the continuation of the alleged violation of law.[18] Rather, it is a decision by the directors of the corporation that pursuit of a cause of action based on acts already consummated is not in the best interest of the corporation. Such a determination, like any other business decision, must be made by the corporate directors in the exercise of their sound business judgment. The conclusive effect of such a judgment cannot be affected by the allegedly illegal nature of the initial action which purportedly gives rise to the cause of action. *Cf. Miller v. American Telephone & Telegraph Co.,* 507 F.2d 759 (3d Cir. 1974).[19]

Moreover, this conclusion is all the more appropriate in view of the fact that there is not a scintilla of evidence on the record before me that the political payments in issue here were illegal either under the laws of the United States or of Italy. On the contrary, the Special Committee on the basis of its intensive investigation, and with the concurrence of its Special Counsel, determined that there was no basis for con-

---

18. Put another way, the decision by the Special Committee not to sue does not constitute the ratification of an illegal act. The question of the good faith exercise of sound business judgment is entirely separate from the question of ratification. *See Lasker v. Burks, supra,* 404 F.Supp. 1172, at p. 1180.

19. In *Miller,* stockholders of AT&T brought a derivative action against the corporation and various of its directors based on the failure of AT&T to collect a debt owed to it by the Democratic National Committee. Failure to collect the debt was alleged to have involved a breach of defendant directors' duty to exercise diligence in conducting the affairs of the corporation, to have violated 47 U.S.C. § 202(a) by affording a preference in collection procedures to the Democratic National Committee, and to constitute a "contribution" to the DNC in violation of 18 U.S.C. § 610. The District Court dismissed the action based on the business judgment rule, 364 F.Supp. 648 (E.D.Pa.1973), and the Third Circuit reversed. The Court noted that had plaintiffs' complaint alleged only a failure to pursue a corporate claim, application of the business judgment rule would support the district court's ruling that a shareholder could not attack the decision of the directors. The Court went on to note, however, that where the decision not to collect the debt owed to the corporation was *itself* alleged to be an illegal act, a different rule would apply. Since the Court found that issues had been raised as to whether the defendant directors had breached 18 U.S.C. § 610 as plaintiffs had charged, it concluded that plaintiffs' complaint stated a claim upon which relief could be granted sufficient to withstand a motion to dismiss. In the instant case, the decision by the Special Committee not to sue based on the prior acts of defendant directors is not *itself* an illegal act or the perpetuation of an illegal act.

cluding that the Italian payments were in any way illegal.

In recent months, the legality and morality of foreign political contributions, bribes and other payments by American corporations has been widely debated.[20] The issue before me for decision, however, is not whether the payments made by Esso Italiana to Italian political parties and other unauthorized payments were proper or improper. Were the court to frame the issue in this way, it would necessarily involve itself in the business decisions of every corporation, and be required to mediate between the judgment of the directors and the judgment of the shareholders with regard to particular corporate actions. As Mr. Justice Brandeis said in his concurring opinion in *Ashwander v. Tennessee Valley Authority, supra,* 297 U.S. at 343, 56 S.Ct. at 481, "[i]f a stockholder could compel the officers to enforce every legal right, courts instead of chosen officers, would be the arbiters of the corporation's fate." Rather, the issue is whether the Special Committee, acting as Exxon's Board of Directors and in the sound exercise of their business judgment, may determine that a suit against any present or former director or officer

would be contrary to the best interests of the corporation.

Again, to quote Mr. Justice Brandeis,

"Mere belief that corporate action, taken or contemplated, is illegal gives the stockholder no greater right to interfere than is possessed by any other citizen. Stockholders are not guardians of the public. The function of guarding the public against the acts deemed illegal rests with the public officials." *Ashwander v. Tennessee Valley Authority, supra,* 297 U.S. at 343, 56 S.Ct. at 481.

Nor can this court ask, as did Juvenal, "Sed quis custodiet ipsos custodes."[21]

## V

Plaintiff also calls into question the disinterestedness and bona fides of the Special Committee, suggesting that the members of the Special Committee may have been personally involved in the transactions in question, or, at the least, interested in the alleged wrongdoing "in a way calculated to impair their exercise of business judgment on behalf of the corporation." *Klotz v. Consolidated Edison of New York, Inc., supra,* 386 F.Supp. at 581.[22]

---

20. *See, e. g.,* Securities and Exchange Commission, Report on Questionable and Illegal Corporate Payments and Practices, submitted to the Committee on Banking, Housing and Urban Affairs, United States Senate, 94th Cong., 2d Sess. (May 1976); Hearings on S. 3133 Before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (April 5, 7 and 8, 1976); Hearings on S. 3133, S. 3379 and S. 3418 Before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. (May 18, 1976); McCloy, Corporations: *The Problems of Political Contributions and Other Payments at Home and Overseas,* 31 The Record of the Association of the Bar of the City of New York 306 (1976).

21. "But who is to guard the guards themselves?" VI Juvenal, *Satires,* 1. 347.

22. Exxon's Rule 9(g) statement alleges that "the aforesaid determinations and resolutions of the Special Committee on Litigation, acting as the Board of Directors of Exxon for this purpose, were made by its members in the independent, disinterested and good faith exer-

cise of their business judgment as to the best interests of Exxon and its shareholders."

At a hearing held on February 27, 1976, plaintiff, for the first time, questioned the independence and bona fides of the members of the Special Committee. Subsequently, on March 2, 1976, plaintiff submitted to the court a statement pursuant to Rule 9(g), challenging defendants' assertion that the resolution of the Special Committee was made in the independent, disinterested and good faith exercise of their business judgment. Rule 56, F.R.Civ.P., requires that the moving party demonstrate, on the basis of admissible evidence adduced from persons with personal knowledge of the facts, that "there is no genuine issue as to any material fact." *See Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Where this initial showing is not made, summary judgment will be denied, even though the party opposing the motion has submitted no probative evidence to support its position or to establish that there is a genuine issue for trial. *See United States v. Pent-R-Books, Inc.,* 538 F.2d 519, 529 (2d Cir., 1976).

With the foregoing in mind, I am constrained to conclude that it is premature at this stage of the lawsuit to grant summary judgment. Plaintiff must be given an opportunity to test the bona fides and independence of the Special Committee through discovery and, if necessary, at a plenary hearing. *See, e. g., Lasker v. Burks, supra,* 404 F.Supp. 1172, at p. 1180; *Bernstein v. Mediobanca Banca di Credito Finanziario— S.p.A., supra,* 69 F.R.D. at 598. Issues of intent, motivation, and good faith are particularly inappropriate for summary disposition. *See, e. g., United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *see also Home Insurance Co. v. Aetna Casualty and Surety Co.,* 528 F.2d 1388 (2d Cir. 1976).

Accordingly, defendants' motion for summary judgment is hereby denied without prejudice to its renewal after plaintiff has conducted relevant discovery. Plaintiff will be given 60 days from the date of entry of this order to conduct discovery, and if necessary to request a hearing, in order to put before the court significant probative evidence tending to support its position. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

SO ORDERED.