Martin ROSENGARTEN, Plaintiff,

v.

INTERNATIONAL TELEPHONE & TELEGRAPH CORP., Francis J. Dunleavy, Lyman C. Hamilton, Jr., Harold S. Geneen, Richard E. Bennett, Eugene R. Black, Raymond L. Brittenham, George R. Brown, Pomeroy Day, Alvin E. Friedman, J. Patrick Lannan, James V. Lester, John A. McCone, Richard S. Perkins, Felix G. Rohatyn, and Herbert B. Schoen, Defendants.

Louis W. GOODKIND, Plaintiff,

v.

Harold S. GENEEN, Francis J. Dunleavy, John J. Navin, Lyman C. Hamilton, Jr., Richard E. Bennett, Eugene R. Black,

Raymond L. Brittenham, George R. Brown, Pomeroy Day, W. Elfers, Alvin E. Friedman, Herbert C. Knortz, J. Patrick Lannan, James V. Lester, John A. McCone, Richard S. Perkins, Felix G. Rohatyn, H. P. Schoen, Ted B. Westfall and International Telephone & Telegraph Corp., Defendants.

Mitchell A. KRAMER, Plaintiff,

v.

INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Herbert C. Knortz, Harold S. Geneen and Arthur Andersen & Co., Defendants.

Elise MESH, Plaintiff,

v.

Richard E. BENNETT, Eugene R. Black, Raymond L. Brittenham, Anthony J. Bryan, Pomeroy Day, Francis J. Dunleavy, William Elfers, Alvin E. Friedman, Harold S. Geneen, Frederic C. Hamilton, Lyman C. Hamilton, Jr., Herbert C. Knortz, J. Patrick Lannan, James V. Lester, John A. McCone, Richard S. Perkins, Felix G. Rohatyn, Herbert P. Schoen, International Telephone and Telegraph Corporation, and "John Doe", "Richard Roe" and other "John Does", said names being fictitious, their true names being presently unknown to plaintiff, the parties intended being present and former officers and employees of International Telephone and Telegraph Corporation and its subsidiaries who participated in its Career Executive Incentive Stock Purchase Plan, Defendants.

Nos. 76 Civ. 1249, 76 Civ. 1271, 76 Civ. 4608 and 76 Civ. 5539.

United States District Court, S. D. New York.

Feb. 28, 1979.

As Corrected March 5 and 13, 1979.

As Corrected April 12, 1979.

Shatzkin, Cooper, Labaton, Rudoff & Bandler, New York City, for plaintiff Martin Rosengarten.

Kass, Goodkind, Wechsler & Gerstein, New York City, for plaintiff Louis W. Goodkind.

Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for plaintiff Mitchell A. Kramer.

Levy & Levy, New York City, for plaintiff Elise Mesh.

Wormser, Kiely, Alessandroni & McCann, New York City, for defendant Intern. Tel. & Tel. Corp.

Davis, Polk & Wardwell, New York City, for defendants Geneen et al.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Wilson & McIlvaine, Chicago, Ill., for defendant Arthur Andersen & Co.

LASKER, District Judge.

These four derivative actions, brought by minority stockholders of the International Telephone and Telegraph Corporation (ITT), allege violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk, breach of fiduciary duty, waste and common law fraud, arising out of "questionable payments"[1] made by employees of ITT, at home and abroad, between 1971 and 1975.[2]

The defendants, directors of ITT and Arthur Andersen & Co., ITT's independent auditor, move for summary judgment under Rule 56, Fed.R.Civ.P., dismissing all the complaints on the ground that the suits are barred by the determination of a disinterested committee of the ITT Board of Directors, in the exercise of its business judg-

---

[1] The term "questionable payments" has become a classic euphemism to describe bribes, kickbacks and other expenditures by a corporation to secure favors. It is used here also to refer to both legal and illegal political contributions.

[2] *Mesh v. Bennett, et al.*, begins with the year 1968 and *Kramer v. ITT, et al.*, includes 1976. However, neither complaint alleges that any specific payments were made during these years and both investigations by ITT have found that the relevant period is between 1971 and 1975.

ment, that pursuit of these actions is not in the best interest of the corporation. Alternatively, the defendants move to dismiss the complaints under Rule 12(b)(6) for failure to state a claim. In opposition, the plaintiffs argue that the business judgment rule is inapplicable to the facts of this case and that the complaints are legally sufficient.

## I.

In December of 1975, the Legal Affairs Committee of ITT's Board of Directors undertook an investigation of possibly improper payments made by the corporation during the years 1971 through 1975. The decision to conduct this review followed two widely publicized investigations by Committees of the United States Senate[3] into ITT's political contributions in Chile during the early 1970s and an inquiry by the Securities Exchange Commission (SEC) into ITT's activities abroad with particular emphasis on tax payments by the corporation's subsidiaries in Italy. The investigation, which was conducted jointly by ITT's Legal Department and by a New York City law firm, involved the examinations, through both questionnaires and interviews, of seventy ITT executives, domestic and foreign, as to political contributions, payments to governmental and commercial customers and mislabelling of accounts.

The results of the investigation were published in a Special Report included in the 1975 Annual Report to ITT's shareholders, issued in March of 1976, which concluded that during the years 1971 through 1975 approximately $3.8 million was paid, in addition to customary sales commissions, to "assist in developing or improving business opportunities." (1975 Annual Report, p. 20) The Report also disclosed that, during the same period, domestic subsidiaries of ITT contributed approximately $4,300.—appar-

ently illegally[4]—to federal election campaigns; approximately $60,000. to political campaigns in jurisdictions where such payments were legal; and that payments were made to tax officials to adjust prior tax liabilities of newly acquired foreign companies in amounts not included in the total figure. Moreover, the Report noted that "presents" and "payments of modest value" to government officials were made during these years but that the total value of such expenditures was considered insignificant and therefore not included.

The Report concluded that no directors or senior officers of ITT authorized the payments, that the aggregate of the payments was minimal in light of the "scope and magnitude" of ITT's total sales during this period, but also noted that steps had been taken at the March, 1976, meeting of the Board to prevent a recurrence of these practices through the adoption of a "Statement of Corporate Policies and Directives" which, among other things, resolved:

". . . that no assets of the ITT System will be used directly or indirectly, at home or abroad, for political purposes, including the support of any candidate or party, even in those countries where it may be traditional, customary and legal to do so. The ITT System is not to become involved in the internal political affairs of host countries. . . .

"that the ITT System, in its relations with governmental agencies or customers, will not, directly or indirectly, engage in bribery, kickbacks, payoffs, or other corrupt business practices.

\* \* \* \* \* \*

"that ITT System funds or assets will be utilized solely for a lawful and proper purpose and no transfer or expenditure of such funds or assets will be undertaken unless the stated purpose is in fact the

---

3. The investigations were conducted by the Subcommittee on Multinational Corporations of the Senate Foreign Relations Committee and the Select Committee to Study Governmental Operations With Respect to Intelligence Activities, both of which were headed by Senator Church of Idaho.

4. The payments apparently violated federal law prohibiting corporate political contributions in connection with federal elections. See Report of the Special Review Committee, p. 57.

actual purpose, and the transfer or expenditure is authorized in writing and within ITT System policy."

Within two business days of the publication of the Special Report, two of the complaints involved here, *Rosengarten v. ITT, et al.* and *Goodkind v. Geneen, et al.*, were filed. The claims are substantially the same in both. Each complaint, brought on behalf of ITT by minority stockholders, alleges violations of the reporting requirements of § 13(a) of the 1934 Exchange Act, 15 U.S.C. § 78m(a), and of the proxy solicitation rules of § 14(a) of the Act, 15 U.S.C. § 78n(a), stemming from the defendants' failure to disclose the payments set out in the 1975 Annual Report in filings with the SEC and in proxies relating to the election of directors. In addition, *Goodkind* asserts as pendant state law claims that the payments constituted a waste of corporate assets and were made in breach of the defendants' fiduciary duty to ITT. *Mesh v. Bennett, et al.*, filed in December of 1976, has a somewhat different focus. It alleges violations of §§ 13(a), 14(a), and 10(b) of the Exchange Act, 15 U.S.C. §§ 78m(a), 78n(a) and 78j(b), and breach of fiduciary duty as a result of the defendants' failure to disclose the payments at the 1974 annual stockholders' meeting during which amendments to ITT's Career Executive Incentive Stock Purchase Plan (CEISPP) were approved. *Kramer v. ITT, et al.*, commenced in May of 1976 in Philadelphia and subsequently transferred to this court, also alleges wholesale violations of the Exchange Act in connection with the payments disclosed in the Special Report. However, the only defendant who has been served in *Kramer* is Arthur Andersen & Co. which is apparently being sued as an aider and abettor although the complaint sets out no explicit theory of liability against it and, indeed, mentions Andersen only once to identify it as ITT's auditor.

II.

In January of 1977, the ITT Board of Directors established a Special Review Committee composed of three outside directors, not affiliated with the corporation at the time of the wrongs complained of and not named as defendants in the lawsuits, to act for the Board in determining whether it would be in the best interest of ITT to prosecute these derivative suits. The Committee, whose members were Chairman Terry Sanford, former Governor of North Carolina and presently President of Duke University, Thomas W. Keesee Jr., Director of the Bessemer Securities Corporation, and Frederic C. Hamilton, President of Hamilton Brothers Oil Company, set out to fill in possible gaps in the findings of the earlier Legal Affairs Committee Report. In particular, the Special Review Committee (1) focused on payments by foreign subsidiaries of ITT which had refused to give more than limited information as to their export payments to the earlier investigators and (2) attempted to assign a dollar figure to payments, such as Italian tax expenditures, known of at the time of the Special Report but not examined in detail.

The Committee concluded in an eighty page report that the total amount of questionable, or possibly questionable, payments made by ITT during the period 1971 through 1975 was $8.7 million and that the aggregate amount of political contributions approximated $189,000. These figures are in contrast to the $3.5 million [5] in questionable payments and $64,300. in political contributions listed in the earlier findings. Of the additional $5.2 million in questionable payments uncovered by the Sanford Committee, $3.5 million was attributed to payments in connection with export sales by two foreign subsidiaries, $1.2 million to the payments described generally in the Special Report as "presents" and "payments of modest value", and $500,000. to payments by newly acquired Italian subsidiaries in settlement of tax liabilities. The additional

---

5. Although the total figure reached by the Legal Affairs Committee investigation was $3.8 million in questionable payments, this sum included a $300,000. reserve for payments which

"might have been made but were not uncovered by the prior investigation." Report of the Special Review Committee, p. 33 n.*.

political contributions were attributed to a $125,000. payment in 1972 to the anti-communist Chilean newspaper, *El Mercurio.* The aggregate figure reached by the Sanford Committee for political contributions does not include two payments made in 1970, prior to the period covered in the Committee's report, of $350,000. to the political campaign of Jorge Alessandri Rodriguez, the conservative opponent of Salvador Allende Gossens in the 1970 presidential election, and an earlier payment of $100,-000. to *El Mercurio.*

Despite the discovery of payments substantially in excess of those described in the Special Report, the Sanford Committee concluded that it would not be in the best interest of ITT to prosecute the derivative actions. The Committee noted that the vast majority of the payments were made in countries where such expenditures are legal; indeed, in many cases the payments were a necessary means of obtaining business. It concluded that there had been no waste of ITT's assets since the payments appeared to have been motivated by a desire to further the business interests of ITT rather than by self-dealing and did not appear to have injured the corporation. Moreover, the Committee found that none of the defendants, including Arthur Andersen, had acted negligently or otherwise improperly; and that the suits were unnecessary as policing actions since the possibility of recurrence was slight in light of ITT's new written guidelines forbidding such practices. Finally, the Committee noted the substantial problems which prosecution of the litigation presented, including the costs of maintaining the lawsuits, the disruption to the corporation of having its management subject to suit, and serious questions as to whether any of the complaints stated a cause of action. For all these reasons, the Committee concluded that it would not be to the interest or benefit of ITT to prosecute the suits.

## III.

■ It has long been the rule that the decision whether to conduct litigation on behalf of a corporation is to be made, like other matters relating to the management of internal corporate affairs, by the corporate directors in the exercise of their business judgment. *United Copper Securities Co. v. Amalgamated Copper Co.,* 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119 (1917); *Hawes v. Oakland,* 104 U.S. 450, 456–57, 26 L.Ed. 827 (1881); *Alleghany Corp. v. Kirby,* 344 F.2d 571, 573 (2d Cir. 1965). This rule is inapplicable only when "the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment," *United Copper Securities Co., supra,* 244 U.S. at 264, 37 S.Ct. at 510. In recent years, several courts have held that a disinterested minority of the Board may exercise its business judgment to bar a derivative action deemed not to be in the interest of the corporation even when a majority of the directors are named in the complaint as defendants. Two courts have considered this question in the context of derivative actions alleging, as here, injury to the corporation as a result of improper payments. In *Gall v. Exxon,* 418 F.Supp. 508 (S.D.N.Y.1976), a minority stockholder sued on behalf of Exxon to recover from the directors $59 million in corporate contributions to Italian political parties, and others, designed to secure political favors. The court held that the decision of an independent three member Committee of the Board to oppose the litigation should be sustained:

> ". . . absent allegations of fraud, collusion, self-interest, dishonesty or other misconduct of a breach of trust nature, and absent allegations that the business judgment exercised was grossly unsound" 418 F.Supp. 508, 516.

In *Auerbach v. Bennett,* 64 A.D.2d 98, 408 N.Y.S.2d 83 (2d Dept. 1978), a Special Committee of three disinterested directors of General Telephone and Electronics (GTE) had decided that it was not in the interest of GTE to prosecute several derivative actions arising out of payments by GTE of $11 million in bribes and kickbacks during 1971 through 1975. The Appellate Division found that the validity of the Committee's decision:

". . . clearly depends on the depth and amplitude of the investigation and the emphasis placed by the committee on the various factors necessarily to be considered. Those factors would include, among others, the reasons for the payments, the advantages or disadvantages accruing to the corporation by reason of the transactions, the extent of the participation or profit by the respondent directors and the loss, if any, of public confidence in the corporation which might be incurred. Moreover, the hesitancy which might arise in outside directors by their investigation of the activities of fellow directors, especially when personal liability is at stake, is a consideration of moment." 64 A.D.2d 98, 408 N.Y.S.2d 83, 87–88.[6]

Out of concern for the interest of the shareholders in probing the motivation, good faith and thoroughness of the minority directors, the courts in both *Gall* and *Auerbach* held that summary judgment in favor of the defendants was inappropriate prior to discovery of the Committee members. Accordingly, the decision on the motion for summary judgment here was postponed pending deposition by the plaintiffs of Sanford, Keesee and Hamilton. Discovery has now been completed, and the plaintiffs raise the following objections to the grant of the motion.

### IV.

The plaintiffs raise three separate objections to the motion for summary judgment. They argue that the applicability of the business judgment rule to lawsuits naming corporate directors as defendants is questionable in light of a recent decision by the Court of Appeals; that the rule cannot ratify illegal acts; and that the investiga-

tion of this particular Committee was not sufficiently thorough or disinterested to satisfy the standard set out in *Auerbach*.

The plaintiffs contend that the recent decision in *Lasker v. Burks*, 567 F.2d 1208 (2d Cir. 1978), *cert. granted*, —— U.S. ——, 99 S.Ct. 75, 58 L.Ed.2d 106 (1978), casts doubt on the validity, of the practice of permitting minority directors to terminate a derivative action naming as defendants other members of the Board, particularly when the minority directors were appointed to the Board by the defendant directors. In *Lasker*, minority directors of a mutual fund recommended that the fund oppose a derivative action against the fund's majority directors and its investment adviser to recover losses sustained from the purchase of Penn Central notes. The Court of Appeals reversed the district judge's grant of summary judgment for the defendants but, in doing so, it relied expressly on the special conflicts of interest to which directors of investment companies are subject:

". . . the plethora of cases cited by counsel dealing with the powers of boards of directors to terminate stockholder derivative suits and the effect of the demand requirement under Fed.R.Civ.P. 23.1 are inapposite. We base our decision on the unique nature of the investment company and its symbiotic relationship with its investment adviser; we need not reach questions of the exercise of similar power by directors of other types of corporations. Moreover, none of these cases involves the situation here, where the terminating directors owe their position as directors to the defendants in the suit." 567 F.2d 1208, 1212 n. 14.[7]

Accordingly, since the particular pressures which concerned the court in *Lasker* are not

**6.** See also *Bernstein v. Mediobanca Banca di Credito Finanziario-S.p.A.*, 69 F.R.D. 592, 595 (S.D.N.Y.1974):

". . . unless the refusal of the directors to sue upon a stockholder's demand was fraudulent or collusive or indicative of something worse than unsound business judgment exercised honestly in the corporate interest, derivative suits may not be maintained by stockholders."

**7.** The plaintiffs argue that the rationale of *Lasker* is particularly appropriate here since the three members of the ITT Special Review Committee were originally appointed to the Board by their fellow directors. However, all three members stood for election and were elected to the Board by the stockholders in May of 1977, six months before the Report was completed.

present, that decision does not bar application of the business judgment rule to the case at hand.

 The plaintiffs also contend that the business judgment rule does not permit ratification of illegal acts. This argument misses the point. A derivative action is designed to redress wrongs to the corporation and not wrongs to the public. If the directors legitimately determine that such an action will not benefit the corporation, then, regardless of the illegality of the underlying transaction, the business judgment rule permits termination of the suit. As Judge Carter stated in *Gall v. Exxon, supra*, 418 F.Supp. at 519:

". . . The issue before me for decision, however, is not whether the payments made by Esso Italiana to Italian political parties and other unauthorized payments were proper or improper. Were the court to frame the issue in this way, it would necessarily involve itself in the business decisions of every corporation, and be required to mediate between the judgment of the directors and the judgment of the shareholders with regard to particular corporate actions. . . . Rather, the issue is whether the Special Committee, acting as Exxon's Board of Directors and in the sound exercise of their business judgment, may determine that a suit against any present or former director or officer would be contrary to the best interests of the corporation."

See *Ashwander v. TVA*, 297 U.S. 288, 343, 56 S.Ct. 466, 481, 80 L.Ed. 688 (1936).[8]

The plaintiffs raise the following specific objections to the good faith of the Special Committee and to the manner in which it conducted its investigation. First, they contend that the Committee delegated all of its functions to its counsel, including

setting the standards for the review, conducting all of the fact-finding and preparing the final report. The depositions indicate that the Committee relied on counsel to perform much of the investigative fact-finding as well as to advise it of the legal standards applicable in the circumstances. For instance, Robert Sisk, the counsel for the Committee, together with members of his firm, reviewed close to 10,000 pages of documentary material from prior proceedings involving questionable payments by ITT, interviewed approximately forty witnesses without the presence of a Committee member, drafted the initial copy of the final report, and advised the Committee of the legal standards concerning: the basis for the review (S.47),[9] the responsibility of the defendant directors (K.75), waste (S.118) and the viability of the derivative complaints (Report, p. 61).

Nevertheless, without listing every aspect of the Committee members' involvement in the review, it is fair to state that the depositions, particularly those of Sanford and Keesee, reveal an impressively thorough participation by them in the investigation. The Committee, which met sixteen times during the course of its year long investigation, determined the scope of the review (S.69–70, 92–93; K.69), studied "reams and reams" of documents supplied by counsel (H.43–44, 64; S.82–83; K.90–91), personally interviewed all but one of the defendants and received oral summaries from counsel of the interviews during which a Committee member was not present (S.83; K.90; H.84), and closely supervised the preparation of the report. When asked to characterize the "input" of the three Committee members in the report, Governor Sanford replied:

8. "Mere belief that corporate action, taken or contemplated, is illegal gives the stockholder no greater right to interfere than is possessed by any other citizen. Stockholders are not guardians of the public. The function of guarding the public against the acts deemed illegal rests with the public officials."

*Miller v. American Telephone and Telegraph*, 507 F.2d 759 (3d Cir. 1974), does not require a

contrary conclusion. There, the complaint alleged that the decision by the Board not to collect a debt owed to the corporation was itself an illegal act. Here, it is not argued that the decision by the Committee not to prosecute these actions is illegal but only that prior payments by ITT may have been illegal.

9. The abbreviations S, K, and H refer to the depositions of Sanford, Keesee and Hamilton.

"[T]otal, because we took the first draft, which was not in the form of a report, but purely in the form of a draft, added our own recollections to it, changed it where we thought it ought to be changed, asked [counsel] to work it over again, so that I would say that word for word, I participated in every word in this report." (S.98)

Thomas Keesee testified that he spent the better part of two days reviewing the report (K.80), while the final two meetings of the Committee were devoted entirely to reviewing the report in detail. (K.42; H.80) Accordingly, the Committee's reliance on its staff was not unreasonable in extent and, in fact, was no greater than that of many busy public officials, including legislators, agency heads and even members of the judiciary. The Committee appears to have supervised those aspects of the investigation in which it was not involved personally and was responsible for the conclusions set out in the report. Moreover, it was entirely proper, indeed desirable, for the Committee to rely on counsel for legal advice.

The plaintiffs also contend that the validity of the Report is called into question by the limited participation of Frederic C. Hamilton in the investigation and by alleged conflicts of interest on the part of both Keesee and Sanford. It is undisputed that Hamilton devoted far less time to the review than either of the other two Committee members. In fact, Hamilton advised Sanford and Keesee at the outset of the review that he could devote only limited time and offered to withdraw. (S.90; H.98–99) The remaining Committee members nevertheless asked him to stay on because the participation of an active member of the business community was considered helpful to the project. There is no reason to quarrel with this conclusion since Hamilton's deposition indicates that, although his grasp of the issues was less thorough than

that of the other two, he was familiar with the substance of the findings and participated in formulating the Committee's conclusions. (H.42–43) Moreover, there is no reason which we know of why the investigation would not have been valid even if conducted by two rather than three directors.

The plaintiffs also question the good faith of Keesee and Sanford who are said to suffer conflicts of interest which prevented them from conducting the investigation impartially. Keesee's alleged conflict consists of his having been a director of Avis, Inc., during a time when that company also made questionable payments, while Sanford is said to be biased because he is named as a defendant, together with all the other directors of Cities Service Company, in a derivative complaint alleging questionable corporate payments by that company. However, during the course of the depositions the plaintiffs failed to establish that either man was personally involved in the payments or even knew that they had been made prior to public disclosure. In fact, Keesee testified that the subject of sensitive payments was brought up before the Avis Board only once, immediately prior to his leaving the company, and even then it was not known that Avis had made such payments. (K.28–29) In the absence of any more tangible showing of bias, following extensive opportunity to examine both men,[10] this objection must fall.

The preceding discussion is not intended to suggest that the work of the Committee is without flaws. The report is noticeably lacking in detail as to where the payments took place, and by whom and to whom they were made. Moreover, it skips somewhat lightly over the possibility of negligence on the part of one director who, although not involved in making payments, failed to investigate with any degree of thoroughness reports of unattributed payments,[11] and

---

10. The depositions of Sanford and Keesee alone cover more than 370 pages of testimony. The transcript of the deposition of Frederic Hamilton is 110 pages long.

11. Francis J. Dunleavy, one of ITT's executive vice-presidents, when asked by the Comptroller of the corporation to investigate certain unaccounted for payments by a foreign subsidiary, merely accepted, without further inquiry, the

does not quantify apparently small but widespread "grease"[12] payments.

Nevertheless, these omissions do not cast serious doubt on the overall thoroughness of the investigation, which uncovered more than twice the amount of payments previously listed, nor do they affect the validity of the Committee's conclusions. In deciding whether ITT should pursue the lawsuits, the Committee analyzed all the factors imposed on such a committee by the court in *Auerbach v. Bennett, supra*, 408 N.Y.S.2d at 87–88, and determined that they weighed against prosecution of the lawsuits. The Committee found that the payments were motivated by a desire to benefit ITT by obtaining and facilitating business for the corporation. It determined that the payments did not harm ITT since the bulk of the expenditures constituted an apparently effective means of securing business. Moreover, the vast majority of the payments were recorded, although labelled misleadingly, and therefore reflected in every bid or contract before it was approved.

The Committee found, further, that there was no evidence that any employee had profited personally from the payments and no evidence that any of the defendant directors participated in the payments.[13] While it did not expressly consider the possibility of loss of public confidence as a result of the payments, the Committee found no evidence that the business of the corporation had suffered in the period following publication of the Special Report and believed that questionable payments of $8.7 million during a period in which ITT's total sales approximated $50 billion and produced earnings of $2 billion would not be material to present or potential investors of ITT. The final factor in *Auerbach*: whether the outside directors were hesitant to question the conduct of their management colleagues, is answered by the thoroughness of the Committee's review and the failure of the plaintiffs to establish at the depositions that the Committee members were unduly influenced in favor of the defendants by friendship or other conflict of interest.

Two further considerations, not set out in *Auerbach* but discussed by the Committee, are worthy of mention. First, as the Committee emphasized, the necessity for the litigation as a deterrent to future wrongdoing of a similar nature is questionable in light of the adoption by the Board of policies expressly forbidding improper payments and of procedures designed to impede them.[14] Moreover, the change in the climate of the times following extensive publicity of widespread corporate payments of a questionable nature and the passage of legislation[15] forbidding such action substan-

---

assurances of the subsidiary's manager that the payments had a valid business purpose. Moreover, the Committee found some suggestion, not elaborated on in the Report, that Dunleavy knew of ITT's political contributions in Chile.

12. "Grease" payments are defined by the Committee to include "payments or presents of relatively small value to government employees in order to obtain permits, licenses, approvals, or other procedural or administrative assistance." Report, p. 39 n.*.

13. In connection with the complaint in *Kramer*, the following findings made by the Committee as to the role of Arthur Andersen & Company in the payments are relevant: 1) that a number of accounting irregularities had been discovered and reported to ITT's Comptroller, Herbert C. Knortz, by Andersen; and 2) that other inaccuracies in the corporate records, including those relating to political contributions in Chile, had either not been discovered or had been

reported to middle level employees rather than to the Audit Committee. However, the latter factor was not attributed by the Committee to negligence on Andersen's part but to the fact that Andersen had not been retained to conduct audits sufficiently detailed to uncover irregularities of the sort involved here. (See Engagement Letter of September 21, 1972, Appendix G to the Report of the Special Review Committee).

14. See "Statement of Corporate Policies and Directives" *supra*. For instance, the transfer or expenditure of corporate funds can now be made only if written authorization is secured.

15. In 1977, Congress passed the Foreign Corrupt Practices Act, Pub.L. No. 95–213, 91 Stat. 1494 (1977), which makes it a crime for an American company to bribe a foreign governmental official and increases the reporting requirements imposed on corporations subject to the Securities Exchange Act.

tially decreases the likelihood of recurrence. Second, as discussed in the following section, the Committee's decision that these lawsuits should not be prosecuted was influenced by serious, and legitimate, doubts as to whether any of the complaints states a federal cause of action and could therefore be maintained in this court.

## V.

In order to approve the Committee's decision not to pursue these lawsuits it is not necessary to rule conclusively that none of the actions states a claim; it is enough to point out that all four complaints suffer from substantial weaknesses.

Each complaint alleges that the defendants, by failing to disclose the questionable payments in reports filed with the SEC, violated § 12(b)(1)(I) [16] and/or § 13(a) [17] of the Securities Exchange Act. No express private right of action exists under either of these sections, however, and the courts have consistently held that the exclusive remedy for violation of these reporting requirements is a suit under § 18(a) of the Exchange Act which provides a civil remedy for damages resulting from a purchase or sale of securities made in reliance on a misleading SEC filing. *In re Penn Central Securities Litigation*, 347 F.Supp. 1327 (E.D. Pa.1972), *modified on other grounds*, 357 F.Supp. 869 (E.D.Pa.1973), *aff'd*, 494 F.2d 528 (3d Cir. 1974); *Meer v. United Brands Co.*, [1976–77 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,648 (S.D.N.Y.1976); *Myers v. American Leisure Time Enterprises, Inc.*, 402 F.Supp. 213 (S.D.N.Y.1975). Since none of the complaints alleges such a purchase or sale by ITT, the party on whose behalf the actions are brought, they do not state a claim under either § 12(b) or § 13(a).

■■■■ Both *Rosengarten* and *Goodkind* allege violations of § 14(a) of the Exchange Act, stemming from the directors' failure to disclose the payments in proxy statements concerning the reelection of ITT directors. While it is clear that a private right of action exists under § 14(a), *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), a plaintiff must allege that the proxy solicitation was an "essential link" in the transaction damaging the corporation to state a claim. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Here, the plaintiffs allege that, had the questionable payments been disclosed in proxies concerning the reelection of directors, the directors would not have been reelected and waste of ITT's assets from further such payments could have been avoided. However, numerous courts in this circuit, dealing with complaints based on similar facts, have held that such an allegation does not satisfy the causation requirement of *Mills* since the improper payments were not directly authorized by the proxies but were merely an incident to the reelection of the directors. *Limmer v. General Telephone and Electronics*, [1977–78 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977); *Lewis v. Elam*, [1977–78 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 96,013 (S.D.N.Y.1977); *Levy v. Johnson*, [1976–77 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977). In *Levy*, the court rejected a similar argument that 'but for' the proxy violations the defendants would not have been elected and could not have authorized further payments, as going beyond the scope of federal securities law:

"[I]f the court were to adopt the plaintiff's standard, any suppression of a directors' impropriety in proxy materials for re-election, followed by a further impropriety after re-election, would state a claim under federal law. It was not intended that, by reason of a proxy violation, a purely state claim might be so transformed into a federal cause of action." *Levy, supra*, at 91,324.

---

**16.** Section 12(b)(1)(I), 15 U.S.C. § 78*l* (b)(1)(I), provides that, in order to register a security, the issuer must file an application with the SEC providing information concerning, inter alia, material contracts not made in the ordinary course of business.

**17.** Section 13(a), 15 U.S.C. § 78m(a), requires every issuer of a security registered under § 78*l* to file annual reports and updating information concerning the contents of a registration statement.

Thus, under existing authority in this circuit, neither *Rosengarten* nor *Goodkind* states a valid § 14(a) claim.

The *Kramer* complaint, in addition to claims under § 12(b)(1)(I) and § 13, alleges violations of §§ 14(a) and 10(b) of the Securities Exchange Act. Because the complaint and the exhibits attached to the complaint make no mention of a proxy solicitation, there is no basis for a claim under § 14(a). Moreover, there is no allegation that the questionable payments were fraudulently concealed in connection with a purchase or sale of securities by ITT or to the detriment of the corporation, and therefore the claim under § 10(b) is insufficient. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Finally, it should be pointed out that plaintiff's failure to serve ITT itself, an indispensable party to the litigation, is a fatal defect to the maintenance of this derivative action on behalf of ITT. See *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Greenberg v. Giannini*, 140 F.2d 550, 554 (2d Cir. 1944); 3A *Moore's Federal Practice* ¶ 19.13[1] (2d ed. 1978).[18]

The claims in *Mesh v. Bennett* are based on the 1974 amendments to ITT's Career Executive Incentive Stock Purchase Plan (CEISPP). In 1968, following a vote of the stockholders, ITT implemented a plan which permitted management employees to buy corporate stock at a price below market value but significantly restricted the employees' ability to resell such stock.

In 1974, the Board put before the stockholders proposed amendments to the CEISPP which removed substantially all restrictions on the resale of the shares bought under the plan. *Mesh* alleges that the proxy statement issued in connection with the 1974 amendments violated § 14(a) of the Exchange Act by failing to disclose (1) that the directors were responsible for $3.8 million in questionable payments, and (2) that a repurchase of stock held under the plan by ITT following the amendments would cost the corporation $17 million.

The defendants again argue that the claim under § 14(a) is defective under *Mills* since the damage alleged was caused by the repurchase of stock which followed the amendments rather than by the CEISPP amendments themselves. However, since it appears that the sole purpose of the CEISPP amendments was to authorize sales of the restricted stock, such as that repurchased by ITT, the causal link between the proxy statement and the damage to ITT may be sufficient to state a claim although we make no such determination. Even so, we believe that the express findings of the Committee that no evidence exists to link the named defendants to the questionable payments and that payments of approximately $9 million during a period of tremendous corporate prosperity would not have been material to the stockholders support the decision not to pursue that part of the § 14(a) claim which is based on the questionable payments. However, the alleged failure to disclose that the amend-

---

18. *Kramer* also alleges common law claims of breach of fiduciary duty and fraud. However, since both the plaintiff and several general partners of Arthur Andersen & Co., the only defendant served in this action, are residents of Pennsylvania (see Affidavit of Leonard Podolin, Exhibit G to Newlon Affidavit of October 6, 1978) diversity jurisdiction is not present. See *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 456, 20 S.Ct. 690, 44 L.Ed. 842 (1900); *Lewis v. Odell*, 503 F.2d 445, 446 (2d Cir. 1974). Moreover, since none of the federal causes of action states a claim, there is no basis to consider the state law claims under pendent jurisdiction. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Andersen raises numerous additional objections to the claims brought under §§ 10(b) and 14(a) of the Exchange Act, including, concerning § 10(b), failure to allege fraud with specificity as required by Rule 9(b), Fed.R.Civ.P., and that § 14(a) does not impose liability upon accountants. See *Gould v. Hawaiian Steamship Company*, 351 F.Supp. 853, 865 (D.Del. 1972), *vacated on other grounds*, 535 F.2d 761 (3d Cir. 1976); *Browning Debenture Holders Committee v. DASA*, Dkt. No. 72–1332 (S.D. N.Y. April 18, 1975), *aff'd*, 560 F.2d 1078, 1085 (2d Cir. 1977). Without ruling on these objections, we find that they cast further doubt on the sufficiency of the claims.

 

ments would cost ITT $17 million is a claim which is unrelated to the Committee's investigation into questionable payments and therefore unaffected by the motion for summary judgment. Nevertheless, this claim is dismissed because, at present, the only clear allegation, under this theory is made in the affidavit of Mesh's counsel [19] and not in the complaint itself. However, Mesh is given leave to replead to state a proper cause of action under this theory in the complaint.

*Mesh* also alleges that the repurchase of stock which followed the approval of the CEISPP amendments violated § 10(b) of the Securities Exchange Act. However, the only deception alleged in the complaint is the failure to disclose certain information in the CEISPP proxies. The fact that, following approval of the amendments, ITT repurchased some of its stock does not convert what is at most a claim of deception in a proxy solicitation into a claim of deception in the purchase of securities.[20]

In sum, there is substantial authority for the Committee's conclusion that none of the four actions would withstand a motion to dismiss in federal court.

■ In light of all the factors discussed above, we find that the Committee's decision not to pursue these lawsuits was made in the exercise of its bona fide business judgment. This finding does not deal with the propriety or impropriety of the practices which are the subject of the lawsuits. It is based solely on the Committee's conclusion that the prosecution of these actions would cause more harm than benefit to ITT and its stockholders.

The motions for summary judgment dismissing the complaints are granted with the

exception of that part of the § 14 claim in *Mesh* described above, which is dismissed without prejudice to repleading within twenty days of the filing of this opinion. The Clerk of the Court is directed to enter judgment in favor of the defendants if an amended complaint is not filed within this period.

It is so ordered.

---

**19.** Affidavit of Morris J. Levy, June 7, 1978, p. 3.

**20.** Since federal jurisdiction in *Mesh* is also based on diversity of citizenship, a state claim that the directors violated their fiduciary duty to the corporation would survive dismissal of the claims under the Securities Exchange Act. The Committee found that none of the directors named as defendants was involved in making the payments and, although they failed to dis-

cover and terminate the payments, that the directors discharged their duties "with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances" (Report, p. 77). Therefore, although this claim is not legally insufficient, the Committee satisfied itself, following what appears to have been a thorough investigation of the defendants, that there was no evidence to support a claim of breach of fiduciary duty.