**Athalie Doris JOY, Plaintiff,**

v.

**Nelson L. NORTH, et al., Defendants.**

**Civ. No. B–77–385.**

United States District Court, D. Connecticut.

Aug. 10, 1981.

Arthur A. Hiller, A. Reynolds Gordon, Gordon & Hiller, Bridgeport, Conn., for plaintiff.

John S. Murtha, John C. Yavis, Jr., Francis J. Brady, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for Conn. Financial Services Corp.

Doris B. Shiller, D. S. Maclay, Marsh, Day & Calhoun, Bridgeport, Conn., for Conn. Financial Services Corp. and Citytrust.

William S. Secor, Jr., Donald McPartland, Waterbury, Conn., James L. Ackerman, Hartford, Conn., for Kellogg and Miller.

Peter K. Leisure, Whitman & Ransom, New York City, Richard F. Lawler, Whitman & Ransom, Stamford, Conn., for Nelson North.

J. Daniel Sagarin, William B. Barnes, Harrigan, Hurwitz, Sagarin & Rutkin, Milford, Conn., Neil P. Coughlan, Day, Berry & Howard, Hartford, Conn., for P. Sagarin.

## MEMORANDUM OF DECISION

EGINTON, District Judge.

This shareholder's derivative action was instituted in 1977 on behalf of Citytrust Bancorp., Inc., (then known as Connecticut Financial Services Corporation), against numerous officers and directors of Bancorp and its wholly owned subsidiary Citytrust (collectively, the "Corporations"). Plaintiff alleges that the defendants violated the National Banks Act, 12 U.S.C. § 21 *et seq.*, and common law fiduciary duties, by authorizing and extending a series of loans for the construction of a building by the Katz Corporation.

During the pendency of the litigation, the Supreme Court held in *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), that federal courts should as a matter of federal law, apply state law governing the authority of independent directors to discontinue derivative suits, even when the cause of action arises under a federal statute. The Supreme Court reversed the Second Circuit Court of Appeals, which had found that as a consequence of a federal statute disinterested directors did not have the power to foreclose the continuation of nonfrivolous litigation brought by shareholders against majority directors for breach of their fiduciary duties. *Id.* at 475, 99 S.Ct. at 1835. The Supreme Court rejected that the existence of federal question jurisdiction rendered state law irrelevant, particularly in the area of corporate law. To the contrary, the *Burks* decision emphasized the importance of state corporation law, "which is the font of corporate directors' powers," as distinct from federal law in this area, which is "largely regulatory and prohibitory in nature—it often limits the exercise of directorial power, but only rarely creates it." *Id.* at 478, 99 S.Ct. at 1837.

 Based on the *Burks* decision, a federal court confronted with a recommendation by a disinterested panel of directors to dismiss a derivative action must as a threshold matter determine whether state law permits such a dismissal and under what circumstances. If so, the next inquiry mandated by *Burks* is whether the state rule is consistent with the policy of the federal statute upon which the derivative suit is based. Finally, even if state and federal law permit an independent committee to initiate a business judgment dismissal, then the federal court must assure itself of the integrity of the committee by reviewing the independence, good faith and thoroughness of the decision. If all three prongs of the *Burks* test have been satisfied, then the committee's recommendation will be upheld.

Immediately following the Supreme Court's decision in *Burks*, the Board of Directors of the Corporations in the instant case authorized the establishment of the Special Litigation Committee (hereinafter the "Committee"), to determine whether the continued prosecution of the derivative suit would serve the best interests of the Corporations. In appointing the Committee, the directors relied on *Burks* and its progeny, and selected two directors, Ms. Marion S. Kellogg and Mr. Ernest C. Trefz, claimed to be independent and disinterested in the derivative litigation.[1] The Committee thereafter retained the law firm of Murtha, Cullina, Richter and Pinney to assist in conducting the investigation. By resolution dated August 15, 1979, the full board delegated to the Committee the power to review, investigate and analyze the circumstances surrounding the pending derivative action. Nine months later, counsel to the Committee submitted a three-volume report, which contained the unanimous recommendation that the suit be dismissed against twenty-three designated defendants, but continued or settled as to the remaining seven defendants.[2]

When plaintiff failed to voluntarily withdraw the claims against the defendants in accordance with the Committee's determination, the Corporations filed motions, first to dismiss and thereafter for summary judgment. This Court repeatedly denied the motions, without prejudice and subject to renewal, to enable plaintiff to conduct limited discovery into the "good faith, motivation and thoroughness" of the Committee's investigation. At the conclusion of the stipulated discovery schedule, the Corporations renewed their motion for summary judgment on the grounds that the business judgment rule was available under state law and had been properly invoked to

1. The Committee's third original member, Alexander L. Stott, resigned on March 3, 1980.

2. Of the twenty-three who seek dismissal, twenty include outside directors of either City-trust or the Bancorp, while the remaining three are either officers or directors of the Corporations.

terminate the derivative suit. Plaintiff, in opposing the motion, contends that even if Connecticut recognizes the business judgment rule (which she vigorously disputes), the Corporations may not foreclose prosecution of claims involving alleged fraud and breach of trust. In addition to a full scale attack on the business judgment rule and the concept of a special litigation committee, plaintiff also challenges every phase of the Committee's investigation, from the procedures employed in its formation to the ultimate substantive conclusions.

## I

### BUSINESS JUDGMENT RULE

■ The power of a corporation to manage daily internal affairs without interference by the courts has long been recognized. The so-called business judgment rule is based on the premise that directors of a corporation have the requisite expertise to resolve the daily business matters which form an integral part of corporate life, an expertise that cannot be matched by courts or shareholders. So long as directors render an unbiased judgment in carrying out their responsibilities, they will not be held liable for honest errors. Nor will the board's decisions be subject to review by outside interests, absent proof of bad faith or prejudice. *Galef v. Alexander*, 615 F.2d 51, 57 (2d Cir. 1980), citing 3A Fletcher, *Cyclopedia of the Law of Private Corporations*, § 1039 (perm. ed. 1975).

■ Since 1917, the Supreme Court has recognized the power of directors to invoke the business judgment rule to determine whether or not to enforce in the courts claims available to the corporation. In *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64, 37 S.Ct. 509, 510–11, 61 L.Ed. 1119 (1917), the Supreme Court held:

> Whether or not a corporation shall seek to enforce in the courts a cause of action for damages, is, like other business questions ordinarily a matter of internal management, and is left to the discretion of the directors, in the absence of instruc-

tion by vote of the stockholders. Courts interfere seldom to control such discretion *intra vires* the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment.

This analysis by the Supreme Court dealing with the *initiation* of a derivative action has been not only followed but expanded. In its most recent decision involving a derivative suit, *Burks v. Lasker, supra*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court noted that it is only consistent with such reasoning to extend directors' discretionary power to include decisions to *terminate* an ongoing derivative suit. *Id.* at 485, 99 S.Ct. at 1840. Whether in a given case a committee of disinterested directors may rely upon the business judgment rule to terminate a suit found to be detrimental to the interests of a corporation depends on the particular state law governing the status and scope of that rule. *Id.* at 480, 99 S.Ct. at 1838.

## II

### STATE LAW

Accordingly, the Court's first inquiry under *Burks* relates to the status of the business judgment rule under applicable state law. In this case, where both Bancorp and Citytrust are incorporated in Connecticut, it must be determined whether Connecticut's corporation law embraces the rule, and if so, whether the scope is sufficient to encompass a decision by an independent committee to terminate a pending derivative suit. Absent any direct statutory or judicial authority for guidance, this Court finds support for the rule in sources including, but not limited to, state court opinions, state statutory scheme, specific statutory provisions, concepts of modern corporate law, and by analogy to other state law schemes.

Connecticut courts have long consistently observed the basic tenet of corporation law that the discretion to manage the daily affairs of a corporation rests with its directors. See, e. g. *Osborne v. Locke Steel*

*Chain Co.*, 153 Conn. 527, 218 A.2d 526 (1966). That discretion, however, is not without its limits. In the earliest Connecticut decision setting forth the doctrine, *Pratt v. Pratt, Read & Co.*, 33 Conn. 446 (1866), the Supreme Court dealt with a request for injunctive relief brought by a group of stockholders seeking to prevent a corporation from devoting surplus funds to the erection of a new building, and to compel distribution of those funds to the stockholders. The court noted that the directors acted without malice, improper motive or fraud, and exercised sound and reasonable judgment and discretion. *Id.* at 451. In refusing to interfere with the directors' proposal, the court nevertheless noted that it would not hesitate to intervene through its equity powers based on a showing that the directors had exceeded their powers as bestowed by the corporate charter. *Id.* at 455.

The parameters set forth in *Pratt* have been followed in the Connecticut decisions of this century. See, e. g. *Van Tassel v. Spring Perch Co.*, 113 Conn. 636, 646–47, 155 A. 832 (1931); *Carten v. Carten*, 153 Conn. 603, 615, 219 A.2d 711 (1966). These decisions wherein the state court has refrained from second-guessing directors' good faith decisions concerning the corporation's best interests represent an implicit acceptance of the business judgment doctrine in Connecticut, with the limitation that not all decisions are insulated from judicial scrutiny on a blanket basis.

■ This Court's finding that the business judgment rule exists as a matter of law in Connecticut is not supported merely by the cases just cited, but finds support also in a review of the state's corporate law scheme and its legislative history. Although no single provision of Connecticut law expressly refers to the business judgment rule, it is derived from the power of the board of directors to manage the corporation, pursuant to C.G.S. § 33–313(a), which states:

> Subject to any provisions pertaining thereto contained in the certificate of incorporation, the business, property and affairs of a corporation shall be managed by or under the direction of its board of directors.

In interpreting a state law provision analogous to this Connecticut statute which invests directors with the power to manage the corporation, the Delaware Supreme Court explained:

> This statute is the fount of directorial powers. The 'business judgment' rule is a judicial creation that presumes propriety, under certain circumstances, in a board's decision. Viewed defensively, it does not create authority ... It is generally used as a defense to an attack on the decision's soundness. The board's managerial decision making power, however, comes from [the statute]. The judicial creation and legislative grant are related because the 'business judgment' rule evolved to give recognition and deference to directors' business expertise when exercising their managerial power under [the statute].

*Zapata Corp. v. Maldonado*, 430 A.2d 779, at 782 (Del.Sup.1981), *rev'g Maldonado v. Flynn*, 413 A.2d 1251 (Del.Ch.1980). Although the Connecticut Supreme Court has not as yet so specifically equated the managing power statute to the existence of a Connecticut business judgment rule, the cases leave no doubt that the rule is a judicial creation, the source of which is found in the legislative grant of authority conferred upon corporate directors by C.G.S. § 33–313(a).

Further support for the existence of the business judgment rule in Connecticut is found in the legislative history of the state's corporate law scheme. One commentator has examined the evolution of corporate law in Connecticut and concluded that the comprehensive revision of the statutes in 1959 to conform to the ALI–ABA Model Business Corporation Act, "brought Connecticut's corporation law into line with, and in some respects well ahead of, the modern trend." S. Cross, *Corporate Law in Connecticut* 38 (1972). Amendments subsequently enacted by the legislature which correlate with changes in the Model Act reflect a continual expansion of the discre-

tionary powers available to directors. The legislative history of one such amendment confirms that the supporters of the proposed addition to C.G.S. § 33–313(d) specifically intended to incorporate the business judgment rule. As one Senator explained:

> The Bill changes the present duty of care pertaining to Directors of corporations from the duly diligent exercise of the duties of his office to the business judgment rule as has been expressed by the Courts.

Senate Reports, Vol. 18, part 3, p. 1418 (May 1, 1975). The constant revision of Connecticut statutes in this area evinces an intention by the legislature to adopt as part of the state's corporation law a broad range of powers associated with the business judgment rule.

 Having thus found that the business judgment rule exists on a broad basis as a matter of Connecticut law, this Court must determine whether the scope of the doctrine is sufficient to encompass a decision by disinterested directors to dismiss a pending derivative suit. This exact question has never been addressed by a Connecticut court, nor for that matter has a Connecticut court ever addressed the question of the discretionary power of a corporation to initiate and maintain a derivative action. Nonetheless, both of these issues are relevant since, as previously noted, the Supreme Court has held that the power to discontinue an action is a logical extension of the power to institute the action. *Burks, supra,* 441 U.S. at 485, 99 S.Ct. at 1840.

In predicting how a state court would rule if presented with this precise question, this Court finds sparse guidance in the previously cited judicial decisions using the business judgment rationale in unrelated contexts, even though the language of the opinions was expansive. This Court primarily relies on the extensive weight of judicial authority in other jurisdictions, wherein courts have found that when state law embraces the business judgment rule, its scope includes a decision by a disinterested and independent committee of directors to terminate a derivative suit, subject to limited review · of the committee's good faith and integrity.[3]

## III

### PLAINTIFF'S INTERPRETATION OF STATE LAW

Notwithstanding the ample percent permitting directors to use a state business judgment rule as authority to terminate an ongoing derivative suit, plaintiff contends that when the action is based on breach of trust or other fiduciary wrongs, Connecticut law requires a different result. To support her position, plaintiff relies on specific statutory provisions and corporate law concepts which are generally applicable to decisions rendered by directors. Once again, no Connecticut court has addressed whether the authority upon which plaintiff relies is relevant in the particular context of a business judgment dismissal of a derivative suit. However, derivative plaintiffs in other jurisdictions have unsuccessfully presented arguments similar to the four made by the instant plaintiff. Those courts confronted with challenges based on analogous laws and concepts have rejected such authority

---

**3.** See, e. g. *Gaines v. Haughton,* 645 F.2d 761 (C.A.9), 1981; *Clark v. Lomas & Nettleton Financial Corp.,* 625 F.2d 49 (5th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1738, 68 L.Ed.2d 224 (1981); *Lewis v. Anderson,* 615 F.2d 778 (9th Cir. 1979), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Galef v. Alexander,* 615 F.2d 51 (2d Cir. 1980); *Abbey v. Control Data Corp.,* 603 F.2d 724 (8th Cir. 1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed.2d 647 (1980); *Cramer v. GTE Corp.,* 582 F.2d 259 (3d Cir. 1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Abramowitz v. Posner,* 513 F.Supp. 120 (S.D.N.Y.1981); *Maldonado v. Flynn,* 485 F.Supp. 274 (S.D.N.Y.1980), *appeal docketed,* No. 80–7221 (2d Cir. 1980); *Rosengarten v. International Tel. & Tel. Corp.,* 466 F.Supp. 817 (S.D.N.Y.1979); *Zapata Corp. v. Maldonado,* 430 A.2d 779 (Del.Sup.1981), *rev'd, Maldonado v. Flynn,* 413 A.2d 1251 (Del.Ch.1980); *Lewis v. Adams,* Civ. No. 77–266C (N.D.Okla. 11/15/79); *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D.Mich.1980); *Gall v. Exxon Corp.,* 418 F.Supp. 508 (S.D.N.Y.1976); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

as inapplicable to the specific issues raised when an independent committee votes to terminate a pending derivative suit.

First, plaintiff denies that directors charged with common law breach of trust have power to terminate a suit against themselves. This argument might have merit if the defendants actually charged with violation of trust sought on their own to dismiss the action. Indeed, the Supreme Court has held that directors guilty of misconduct equivalent to breach of trust lack the power under certain circumstances to exercise their business judgment. *United Copper Securities Co., supra,* 244 U.S. at 264, 37 S.Ct. at 510. However, once an independent committee has been appointed, the fate of the derivative suit is no longer in the hands of the defendant directors charged with wrongdoing, but rather is under the exclusive control of a disinterested committee. The focus thus shifts from those accused of breach of trust over to the committee members. So long as the committee consists of directors who are not personally responsible for the breach of trust, or otherwise involved in the alleged illegality, they have the power, properly exercised, to absolve those directors claimed to have breached their fiduciary duties.

Second, plaintiff contends that the right conferred on a shareholder to initiate a lawsuit under the state derivative suit statute, C.G.S. § 52–572j, necessarily confers an absolute right to maintain the action undisturbed by directors in the exercise of their business judgment. Virtually every court faced with this claim has categorically rejected that the right to bring a derivative suit supports an unrestricted right to continue to control it. As the

Ninth Circuit held in *Lewis v. Anderson,* 615 F.2d 778, 783 (9th Cir. 1979), cert. denied, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980):

> To allow one shareholder to incapacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders.

More recently, the Delaware Supreme Court elaborated upon this distinction in *Zapata v. Maldonado, supra,* at 784–785:

> We see no inherent reason why the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit should automatically result in the placement in the hands of the litigating stockholder sole control of the corporate right throughout the litigation. To the contrary, it seems to us that such an inflexible rule would recognize the interest of one person or group to the exclusion of all others within the corporate entity.

This Court agrees that placing continuous control of the corporate cause of action in the exclusive hands of the litigating shareholder would elevate the interests of an isolated group over those of the corporate entity, in a manner neither contemplated by the legislature in enacting the derivative suit statute nor evident in the legislative history.

Even a cursory glance at the derivative suit statute,[4] reveals that the legislature intended to set up a mechanism to formalize a shareholder's power to bring derivative actions on behalf of the corporation. The legislature specifically included limits on a shareholder's power by providing that under certain circumstances, a court had the power to approve dismissal or compro-

---

**4.** Whenever any corporation or any unincorporated association fails to enforce a right which may properly be asserted by it, a derivative action may be brought by one or more shareholders or members to enforce such right, provided such shareholder or member was a shareholder or member at the time of the transaction of which he complained or his membership devolved on him by operation of law. Such action shall be begun by a complaint returnable to the superior court for the county or judicial district in which an office of the corporation or association is located. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

mise of a derivative action, even after it had commenced. That power defeats plaintiff's claim that the statute creates a substantive, indefeasible right in a shareholder to litigate a derivative suit to its conclusion without interference. Moreover, this Court finds no indication that the legislature intended by the derivative suit statute to grant a shareholder unbridled discretion to proceed with a suit in the face of opposition by an independent committee which has found the suit detrimental to the corporation. This Court accordingly finds no substance in plaintiff's reliance on C.G.S. § 52–572j as the source of any absolute right to prosecute the instant suit to verdict.

Plaintiff's third ground for opposing dismissal is based on the alleged inapplicability of the business judgment rule to "non-ratifiable" wrongs. Plaintiff cites numerous decisions in other jurisdictions which hold that neither the board of directors nor a majority of shareholders may by ratification validate a wrong which the corporation itself lacks the power to remedy. According to plaintiff's analysis, by seeking to dismiss claims relating to the alleged wrongful extension of certain loans, the directors are impermissibly attempting to ratify the original (non-ratifiable) conduct. The flaw in this argument was noted by a district court in *Lasker v. Burks*, 404 F.Supp. 1172, 1180 (S.D.N.Y.1975), *rev'd on other grounds*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979):

> The court must also reject plaintiffs' argument that the decision not to sue was tantamount to an illegal ratification. Although it can be argued that derivative suits should be allowed when the Board has refused to sue on a non-ratifiable wrong, the question of business judgment is separate from the question of ratification. Many of the cases which established the business judgment rule and its relation to derivative suits have involved claims which were arguably non-ratifiable.

*Accord, Gall v. Exxon*, 418 F.Supp. 508, 518 n. 18 (S.D.N.Y.1976).

■ To ratify a corporate act involves a limited decision by the directors as to the propriety of certain actions undertaken by those charged with managing the corporation. The directors' concern in a ratification context is therefore primarily whether the underlying conduct being reviewed is legal. If it is concluded that the conduct may expose the corporation to liability, then such wrongful activity may not be ratified. In contrast to a ratification situation, the exercise of business judgment in the context of a derivative suit involves a broader focus, wherein the legality of the underlying claims is only one of numerous factors considered by the board, including but not limited to ethical, commercial, promotional, public relations and fiscal concerns. *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y. S.2d 920, 928, 393 N.E.2d 994, 1002 (1979). Whether the conduct is regarded as legal or not, the directors' paramount concern is whether the prosecution of the suit will harm or benefit the corporation. If, after reviewing the impact on the corporation, the directors determine that the litigation should be disposed of, "the conclusive effect of such a judgment cannot be affected by the alleged illegal nature of the initial action which purportedly gives rise to the cause of action." *Gall v. Exxon, supra*, 418 F.Supp. at 518; *accord, Rosengarten v. ITT*, 466 F.Supp. 817, 824 (S.D.N.Y.1979).

■ Directors possess the power to terminate an action which may be meritorious from a legal standpoint, despite objection of shareholders or the public, because a derivative suit is unique. As a mechanism for correcting corporate wrongs as opposed to public wrongs, a derivative suit concerns rights belonging exclusively to the corporation, and any judgment inures to the sole benefit of the corporation. Therefore, whatever interest a shareholder or the public may have in rectifying unlawful conduct must yield to the business judgment of directors who have in good faith concluded that the corporation ultimately gains rather than loses rights by discontinuing the action.

This does not mean, however, that directors may engage in illegal activity with impunity, relying on the prospect that a disinterested committee will seek dismissal on their behalf. To the contrary, when unlawful acts have been committed, there are other mechanisms available to the public or shareholders to enforce any rights infringed as a result of illegal corporate activities. The government may either prosecute alleged wrongdoers, which serves the public interest by punishing illegal conduct, or a shareholder may bring a direct action, which enables those personally harmed by the conduct to seek redress. These suits are not subject to dismissal at the instance of directors. As such, they provide adequate safeguards against directors who attempt to ratify conduct not capable of ratification. Therefore, plaintiff's reliance on the allegedly non-ratifiable nature of the defendants' conduct in the instant case is misplaced in the context of this derivative suit.

■ Finally, plaintiff contends that from the Committee's formation through the consequent motions to dismiss the suit against the corporation's own directors, there exists a successive chain of self-dealing transactions outside the scope of the business judgment rule. For this proposition, plaintiff relies on C.G.S. § 33–323, pertaining to the voidability of transactions between interested directors and the corporation. According to plaintiff, the fact that thirteen out of a total sixteen directors who appointed the Committee were also named as defendants automatically taints both phases of the Committee process—the formation stage and the final determination. She contends that by allowing interested directors to participate in the vote appointing the Committee, the Corporation insured the selection solely of members certain to recommend dismissal. Based on this premise, plaintiff concludes that an independent Committee, free of self-dealing, is structurally impossible so long as the members owe their appointment to interested directors.

With respect to plaintiff's claims of self-dealing in the formation phase, other courts faced with analogous arguments have conceded the potential for self-dealing or structural bias [5] in the establishment of a special committee. As a New York court noted in *Auerbach, supra* :

> The possible risk of hesitancy on the part of the members of any committee . . . to investigate the activities of fellow members of the board where personal liability is at stake is an inherent, inescapable, given aspect of the corporation's predicament. 419 N.Y.S.2d at 928, 393 N.E.2d at 1002.

This "predicament" exists in the nature of the corporate organization, wherein only the existing board of directors has authority under state law to establish a special committee and to delegate the power to act on behalf of the entire board. Notwithstanding the potential for bias, the same court held that:

> To assign responsibility of the dimension here involved to individuals wholly separate and apart from the board of directors would, except in the most extraordinary circumstances, itself be an act of default and breach of the nondelegable fiduciary duty owed by the members of the board to the corporation and to its shareholders. *Ibid.*

No decision which plaintiff has cited to this Court has held that this unique relationship between defendant directors and the directors they chose to determine the fate of the derivative suit is grounds, standing alone, either to dissolve the Committee or invalidate its results. In fact, to take this position would compel this Court to find self-dealing by the directors even though they followed procedures prescribed by statute and corporate by-laws in appointing an independent Committee. Moreover, to find these procedures infirm and voidable under the statute would place in jeopardy the

---

**5.** Structural bias is inherent prejudice against all derivative suits by virtue of the composition of the board and relationship between directors, whereas actual bias results from a particular director's personal involvement in the specific transactions underlying the suit.

concept of a litigation committee at a time when such committees have become widely accepted, useful tools for disposing of detrimental derivative actions.

As to plaintiff's claims of bias during the Committee's deliberative stage, she accuses the Committee members of continued acts of self-dealing by virtue of their frequent contact with interested directors at board meetings and other functions throughout the period of the investigation. It is this ongoing relationship between the directors on the Committee and the director defendants which plaintiff claims is fatal to the Committee's power to render a business judgment dismissal. This is because, according to plaintiff, these affiliations rendered the decision to dismiss a foregone conclusion. If this Court accepted plaintiff's "conspiracy" argument, it would be compelled to declare the Committee's final recommendation to be a voidable self-dealing transaction, pursuant to C.G.S. § 33–323. In the absence of state judicial or statutory authority applying the self-dealing statute in this context, this Court must predict whether a state court would find that all interaction between defendant directors and non-defendant Committee members rises to the level of a self-dealing transaction sufficient to nullify the Committee's exercise of its business judgment.

This Court has examined the self-dealing statute, as the state court would do, and concludes that the legislature enacted C.G.S. § 33–323 to prohibit directors from reaping personal financial gain at the corporation's expense by exploiting their insider status. Under the terms of the statute, any transaction which results from a director's abuse of his fiduciary position is rendered voidable at the option of the entire board. There is no authority for plaintiff's expansive interpretation of the self-dealing statute as compelling the invalidation of the Committee's final decision merely because its members continued to interact with the director defendants. Absent such authority, this Court declines to construe the statute so broadly, particularly when plaintiff has not produced any evidence of actual self-dealing, as distinct from mere speculation. Only proof of actual self-dealing during either the formation or deliberative phase of the Committee's investigation would warrant a finding that the entire process must be voided.

■ Having thus rejected the last of four grounds which plaintiff raised as state statutory impediments to the application of the business judgment rule in the context of a derivative suit dismissal, this Court finds no remaining barrier under state law to the Committee's exercise of its judgment in the instant case.

## IV

### FEDERAL LAW

■ Once having found that a Connecticut business judgment rule exists and that it permits an independent committee to seek dismissal, this Court must determine whether approval of the Committee's recommendation would conflict with federal law. *Burks v. Lasker, supra,* 441 U.S. at 480, 99 S.Ct. at 1838. When a derivative suit rests in whole or in part on a federal law, in this case the National Banks Act, such law does not render state law irrelevant. To the contrary, the indisputable mandate of *Burks* is that unless federal law directly conflicts with the state scheme or unless application of state law "would be inconsistent with the federal policy underlying the cause of action," state law prevails. *Id.* at 479, 99 S.Ct. at 1837, *citing Johnson v. Railway Express Agency,* 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). This mandate remains true even if the application of state law would cause a derivative plaintiff to lose litigation based on meritorious federal claims. *Ibid.* In fact, the Supreme Court held that federal law would preempt relevant state law only if Congress specifically intended federal law to replace the entire corpus of state corporate law. *Id.* at 478, 99 S.Ct. at 1837. Congress will evince such an intention either by enacting a comprehensive federal scheme which permits of no state variation, or by including an express statutory provision which prevents the corporation from

invoking its state powers. *Id.* at 479, 484, 99 S.Ct. at 1837, 1840. Absent an unequivocal message from Congress that federal law supplies the exclusive rule of decision, or that compelling federal interests override powers conferred by state law, state corporate law must control.

■ In the context of the instant derivative suit, so long as the National Banks Act is not found by this Court to be inconsistent with state law, the Connecticut business judgment rule will dictate whether the Committee may terminate the action. Plaintiff contends that both the letter and the spirit of the National Banks Act, 12 U.S.C. § 21 *et seq.* (hereinafter, the "Act"), conflict with the Committee's power to compel dismissal. She relies on four sections of the Act to support claims of inconsistency between state and federal law: Sections 24 (corporate powers of associations); § 73 (violation of oath of office by directors); § 84 (overline loan); § 93 (director liability for violation of the Act). After listing these provisions, plaintiff concludes, without analysis, that permitting the directors to dismiss would be contrary to and frustrate the purposes of the Act. This Court finds these conclusory remarks insufficient to satisfy *Burks*, which requires a federal court to carefully review the federal law before rendering a decision as to the degree of conflict or consistency between state and federal law. This Court has conducted such a review, and for the following reasons rejects plaintiff's claims of inconsistency.

In support of plaintiff's claim based on § 84, pertaining to overline loans, she contends that the Committee concluded in its report that the directors might be liable for an overline violation with respect to the Katz loans. Based on that alleged finding, plaintiff claims that termination of the suit would conflict with this provision of the Act. However, after reviewing the Committee's report, this Court has found no such admission of liability contained therein. Rather, the figure discussed in the report merely reflects the Committee's valuation of the magnitude of the loans. In fact,

the Committee expressed serious doubt in its report as to whether liability could be found based on the uncertainty of damages suffered by the corporation. Plaintiff has therefore misinterpreted the Committee's conclusion regarding the Katz loans.

■ Even assuming *arguendo* that the directors had authorized an overline loan and plaintiff could prove that such loans violated federal law, *Burks* makes it plain that simply by enacting a federal law, Congress did not require that states, or federal courts, absolutely forbid director termination of all nonfrivolous actions. *Burks, supra,* 441 U.S. at 486, 99 S.Ct. at 1841. The proper inquiry is therefore not whether the federal claims of overline loans have merit, but whether any single provision of the federal statute, such as § 84, specifically prohibits dismissal in accordance with the state's business judgment rule. This Court finds no indication that Congress intended § 84 of the Act to prevent board action from cutting off detrimental derivative suits.

■ With respect to claims of conflict based on Section 24, relating to corporate powers of associations, plaintiff has offered only conclusory statements that applying state law would pose "[a] significant threat to any identifiable federal policy or interest." *Burks, supra,* 441 U.S. at 479, 99 S.Ct. at 1838. This section simply sets forth the general corporate powers of associations. It does not provide that the powers therein are meant to preempt state law. Yet by relying on this provision of the Act, plaintiff attempts to persuade this Court that the mere existence of a broad federal statute requires that state laws governing corporate affairs be displaced. This position has been rejected by the Supreme Court in *Burks*:

Corporations are creatures of state law, and it is state law which is the font of corporate directors' powers. By contrast, federal law in this area is largely regulatory and prohibitory in nature—it often limits the exercise of directorial power, but only rarely creates it ... Congress has never indicated that the entire corpus

of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute. 441 U.S. at 478, 99 S.Ct. at 1837.

The National Banks Act belongs in this category of laws which are primarily regulatory. As the Supreme Court held in *Anderson National Bank v. Luckett*, 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692 (1943), notwithstanding that national banks derive their powers from the federal statute, they remain subject to the laws of the state. This Court therefore finds no basis to plaintiff's claims of conflict between § 24 and state law in the case at bar.

Plaintiff also relies on Section 73 of the Act to support a possible conflict between state and federal law. That provision requires each director to take an oath that he will diligently and honorably administer the corporation's affairs. State law imposes the identical obligation on all directors as fiduciaries, to conduct the business of the corporation in an honest and unprejudiced manner; the two bodies of law coincide rather than conflict. Plaintiff's claims of inconsistency between federal and state law under Section 73 of the Act is therefore without basis.

Finally, Section 93 provides that in the event of a judicial determination of liability in a suit filed by the Comptroller of Currency, a director responsible for violating the statute may be exposed to liability. Plaintiff contends that in the absence of any express language in the federal statute authorizing an independent committee to invoke the state business judgment rule in the face of such a finding of liability, no such power exists. It is the statute's silence with respect to derivative suits and business judgment dismissals which plaintiff claims precludes the Committee from terminating the suit under state law. Confronted with a similar argument under the Investment Advisors and Investment Company Acts in *Burks*, the Supreme Court found that "such silence was to be expected." 441 U.S. at 478, 99 S.Ct. at 1837. This is because federal laws relating to corporate governance do not purport to be a positive source of au-

thority for managerial power, but rather function primarily to impose controls and restrictions on leadership. *Ibid.* For this reason, it is not surprising that neither the National Banks Act nor any other federal statute discussed by the Supreme Court in *Burks* contain direct language referring to the business judgment rule. The Supreme Court did not regard the absence of a formal reference as an impediment to invoking the state business judgment rule. Instead, the Supreme Court fashioned a different test which does not depend on whether the rule literally appears in the federal statute, but whether the state business judgment rule conflicts with a federal law or policy. *Id.* at 479, 99 S.Ct. at 1837.

Admittedly, where a provision such as § 93 of the Act imposes a penalty for a wilful violation, it appears inconsistent with the spirit, if not the letter, of the law to permit state law to prevent federal wrongs from being redressed in the courts. Notwithstanding, courts have repeatedly allowed committees properly constituted under state law to dismiss derivative suits based on nonfrivolous and possibly illegal conduct, so long as the federal law contained no provision expressly forbidding directors from terminating the suit. *Burks, supra,* 441 U.S. at 484, 99 S.Ct. at 1840; *Gall v. Exxon, supra,* 418 F.Supp. at 518; *Rosengarten v. ITT, supra,* 466 F.Supp. at 824. Plaintiff's claims to the contrary, this Court finds no suggestion of a Congressional purpose in § 93 of the Act, or any of its other provisions, to interfere with a business judgment decision made in accordance with state law to discontinue a derivative suit based in part on the National Banks Act.

Finally, there are two features of the instant case which further illustrate that deference to state law would not conflict with federal law. First, the Committee did not recommend dismissal of the entire suit. Rather, it invoked the business judgment rule to terminate only as to those defendants who were not officers at the bank at the time of the extension of the allegedly improper loans. In other words, by allow-

ing plaintiff to proceed with the suit against seven individuals claimed to have been directly responsible for violating federal law, the Committee used state law to effectuate, rather than to defeat, the purposes of federal law.

Second, even if the Act embodies an "identifiable federal policy or interest", *Burks, supra*, 441 U.S. at 479, 99 S.Ct. at 1838, such policy would not be contravened by allowing dismissal of the instant derivative suit against a bank no longer subject to national regulation. Nearly a year before the suit commenced, Citytrust altered its status from a national to a state bank. Subsequent to that time, the bank has been regulated entirely by state mechanisms without interference by federal banking agencies. Thus, the significance of federal interests with respect to this action is *de minimis.* Finding no conflict or inconsistency between the National Banks Act and the state business judgment rule, this Court holds that the second prong of the *Burks* test has been satisfied.

## V

### BONA FIDES

Having completed the first two inquiries under the *Burks* analysis, this Court must finally determine whether the Committee satisfied the requirements of independence, good faith, and thoroughness. Review is limited to these aspects of the Committee's investigation and does not involve an assessment of the merits of the derivative suit.[6] To probe the merits would defeat the purpose of the business judgment rule, which is premised on the expertise of directors to render important business decisions without interference by the courts or shareholders. Although courts may be ill-equipped to evaluate whether a

particular derivative suit serves a corporation's best interests, they are well-suited to determine the *bona fides* of an independent committee's investigation. If, following review, a court finds the investigation to have been incomplete or *pro forma*, a rejection of the committee's decision would be justified. In so scrutinizing the investigative techniques, a court must be cautious not to trespass on the committee's business judgment, or to grant summary judgment unless satisfied that no genuine issue of material fact exists as to its disinterest and integrity. *Auerbach v. Bennett, supra*, 419 N.Y.S.2d at 929, 393 N.E.2d at 1002.

After this Court authorized plaintiff to conduct limited discovery into the Committee's good faith, the parties exchanged an extensive amount of materials. Although plaintiff submitted requests for production beyond the scope of this Court's order, the Committee complied with the majority of requests without objection.[7] Notwithstanding the release of voluminous information during this additional period of discovery, plaintiff devoted only two pages of a lengthy brief to assailing the independence and motivation behind the Committee's investigation. Contained in plaintiff's brief are four areas which she claims bear on the integrity of the investigation. Of those claims, plaintiff has not provided this Court with proof of actual bias sufficient to remove the cloak of judicial protection surrounding the Committee's decision to dismiss.

First, plaintiff challenges Ms. Kellogg's independence on the grounds that while serving as a director in 1976 she voted on the release of the personal guaranty of Debbie Katz, which event was also considered several years later by the Committee during Ms. Kellogg's membership. Granting that the Committee discussed the

---

6. This Court has maintained this position throughout, by limiting plaintiff on three occasions to discovery as to the good faith, motivation and thoroughness of the Committee's investigation. See, e. g. *Rosengarten v. ITT, supra*, 466 F.Supp. 817, 823. Despite these restrictions, plaintiff has continued to address the merits of the underlying action.

7. The Committee produced materials including, but not limited to, Parts I & II of the Special Litigation Committee Report; depositions of Messrs. Murtha and Brady, counsel to the Committee; depositions of additional directors; responses to interrogatories by directors, and production of responses by thirteen defendants to the Committee's questionnaire.

board's approval of the release in its final report, in attempting to impute bias to Ms. Kellogg because she voted to release a guarantor, plaintiff misunderstands the nature of self-interest sufficient to disqualify a Committee member. So long as directors serving on the Committee lack direct personal involvement in the subject matter of the suit, they satisfy the threshold test of independence. In the instant case, this means that Ms. Kellogg must be free only from involvement in the transactions relating to the Katz loans. Since the subject matter of the suit is such loans and not the release of personal guarantors, there is no merit to plaintiff's claim that by participating in the vote to release Debbie Katz, Ms. Kellogg became so interested in the subject matter of the suit as to warrant a finding of prejudicial interest.

To qualify as interested, a Committee member must possess a direct personal stake in the subject matter being litigated. Personal involvement may take the form of authorizing the underlying transaction, as in *Galef v. Alexander, supra*, 615 F.2d 51, holding a financial interest in the conduct at the core of the litigation, as in *Lewis v. Anderson, supra*, 615 F.2d 778, or otherwise reaping a tangible benefit from the challenged activity. Some courts have found that being named a defendant automatically disqualifies a director on grounds of interest for the obvious reason that:

> Where the directors, themselves, are subject to personal liability in the action [they] cannot be expected to determine impartially whether it is warranted.

*Abbey v. Control Data*, 603 F.2d 724, 727 (8th Cir. 1979), *citing United Copper Securities Co., supra*, 244 U.S. 261, 37 S.Ct. 509, 61 L.Ed. 1119. However, other courts have allowed a nominal defendant to serve on a special committee provided the director did not personally gain from the alleged wrongdoing. *Lewis v. Anderson, supra*, 615 F.2d at 780.

Ms. Kellogg belongs in none of the foregoing categories. She was elected to the board on July 21, 1976, and commenced service on September 15, 1976; she neither served on the board during the period of the loans, nor affiliated with the allegedly culpable officers and directors at the time under dispute. (Affidavit in Support of the Corporations' Motion for Summary Judgment).[8] Furthermore, Ms. Kellogg stated in her affidavit that both she and Mr. Trefz excused themselves from all board consideration of the merits of the derivative suit once the investigation commenced. Her conduct in voting on the release of a guarantor, a matter remotely related to the derivative suit, does not rise to the level of personal interest sufficient to disqualify Ms. Kellogg or nullify her vote to dismiss.

Plaintiff's second avenue of attack on the issue of good faith relates to the board's initial refusal to sue, which both Ms. Kellogg and Mr. Trefz voted upon as board members prior to their service on the Committee. Plaintiff contends that any participation at the preliminary stage of the derivative action is conclusive evidence that both members "prejudged" the merits of the case, thereby destroying their independence. This Court grants that an initial decision by the board not to sue represents a consensus among the full board, following demand by the shareholders (unless demand is excused), that the suit should not be brought by the corporation. However, that preliminary decision, like the subsequent decision to terminate an ongoing suit, is not exclusively a review of the merits, but rather is based on a variety of factors all relevant to whether the suit serves the corporation's best interests. See, e. g. *Auerbach, supra*, 419 N.Y.S.2d at 928, 393 N.E.2d at 1002. In fact, when a shareholder first makes demand, little may be known of the substance of the claims or the potential exposure to the corporation if found liable. To claim, as plaintiff does, that the Committee members are presumptively biased by virtue of their vote to resist shareholder

---

**8.** Mr. Trefz was also elected to the board after the 1970–75 period when the loans were extended. He commenced service on January 3, 1977, following his election to the board on December 15, 1976.

demand is to misunderstand the concerns of a corporate board faced with such a demand to sue.

▉ Furthermore, plaintiff has cited no authority which holds that a director who, in the first instance, votes against bringing a derivative suit is incapable of rendering an independent and detached decision four years later following an exhaustive investigation. The facts in the instant case highlight the fallacy of this argument. If Ms. Kellogg and Mr. Trefz had genuinely prejudged the issues, they would have sought dismissal of the entire lawsuit. Only complete dismissal would have been consistent with the board's initial vote against bringing the entire derivative suit in 1977. Instead, the Committee chose the course of partial dismissal, which allows the suit to proceed (or be settled) as to seven defendants. This fact alone belies plaintiff's claims of improper prejudgment.

▉ Third, plaintiff attacks the good faith of both Ms. Kellogg and Mr. Trefz for participating in discussions and voting with the entire board on matters relating to fees expended in defense of the derivative action. Plaintiff has offered no explanation and this Court fails to see how their independence has been compromised for this reason. As part of their responsibility to assess the harm and benefit to the corporation resulting from the suit, Ms. Kellogg and Mr. Trefz were clearly obligated to consider the cost of the litigation to the Corporation. Perhaps the best source of that information is the board meeting, which Committee members continue to attend and in fact must so attend as part of their fiduciary duties as directors. It is only by constant interaction with the full board that a thorough investigation can be conducted, despite plaintiff's preference for complete insulation of the Committee from the remaining directors.

Plaintiff's remaining challenges to the Committee's *bona fides* are elaborations of points already considered. Essentially, plaintiff claims that Ms. Kellogg and Mr. Trefz were at all times predisposed to protect the interests of their co-directors, who obviously opposed the suit and hoped the Committee would follow the path of other independent committees in recommending dismissal. According to plaintiff's theory, a director who maintains an ongoing personal or professional relationship with directors facing liability is *per se* incapable of reaching an impartial decision. Each of these arguments reduces to the same proposition that the structure of the corporate entity renders it impossible for a director to decide the fate of a derivative suit against other directors in a neutral fashion. As this Court has already held, absent concrete proof of actual bias or interest, there is simply no basis to accept plaintiff's "vigorous and imaginative hypothesizing" as sufficient to raise a triable issue of fact as to either the disinterest of the Committee members or the independence of the investigation. *Auerbach, supra,* 419 N.Y.S.2d at 927, 393 N.E.2d at 1001.

Based on this Court's review, not a scintilla of evidence has been offered to prove interest or bias on the part of the Committee members. If anything, the record in the instant case refutes plaintiff's allegations, based on the single fact that although the Committee had the power under the state business judgment rule to dismiss the entire suit, it declined to do so. Instead, the Committee voted to continue or settle the suit as to certain defendants. More than any other fact in this voluminous record, it is this limited exercise of the Committee's discretion which substantiates its good faith.

Finally, to complete this Court's review, it has found no evidence of infirmities in the Committee's procedures nor any factual deficiencies in its findings. Perhaps this is because the thoroughness of the investigation is self-evident. According to affidavits filed by Committee members and counsel, each member devoted a minimum of 100–125 hours to the investigation, while counsel spent an additional 1400 hours. The Committee met seventeen times in formal session and conferred informally on other occasions. Furthermore, based on this Court's careful review of the report, it is apparent

that the Committee interviewed witnesses, consulted with experts, submitted questionnaires to directors and reviewed a plethora of documents. Plaintiff at no point challenges the Committee's thoroughness, but instead rejects its conclusions. This Court has found however, that the business judgment rule forbids disturbing the Committee's substantive conclusions, regardless of whether a court or shareholder would have decided the issues differently. To do so would emasculate the business judgment rule which insulates the Committee's decision from further judicial scrutiny once there has been a finding of good faith and thoroughness.[9] Having found no material dispute as to the integrity of the Committee's investigation, this Court is compelled to accept its business judgment determination to dismiss the derivative suit against the twenty-three designated defendants.

■ For the foregoing reasons, each of the three prerequisites to dismissal as set forth in *Burks* have been satisfied; the Committee was established in a manner fully consistent with all relevant state and federal law and the final decision is the product of a comprehensive investigation undertaken by disinterested directors in good faith. Accordingly, the motion for summary judgment is hereby granted.

It is So Ordered.

---

**9.** In so holding, this Court disagrees with the approach recently adopted by the Delaware Supreme Court in *Zapata v. Maldonado, supra,* at 788–789, wherein the Chancery Court was ordered to render its own business judgment to determine whether the suit should be dismissed. If the purpose of the business judgment rule is to allow those with the expertise, i. e. the directors, to govern the corporation consistent with its best interest, then neither shareholders nor the courts should be free to second-guess the directors. There is simply no basis to assume that a court is more qualified than the directors or the shareholders to assess the merits and value of a derivative suit to the corporation. To the contrary, a court, which has the duty of exercising "judicial judgment", has no business interfering with the exercise of "business judgment."